In re Petition for DISCIPLINARY ACTION AGAINST Arthur W. LaCHAPELLE, an Attorney at Law of the State of Minnesota.

No. C0–91–1953.

Supreme Court of Minnesota.

Oct. 23, 1992.

---

Marcia Johnson, Director of Office of Lawyers Professional Responsibility, Martin A. Cole, Sr. Asst. Director, St. Paul, for petitioner.

Michael J. Hoover, Minneapolis, for respondent.

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action on September 30, 1991. Respondent is charged with:

Intentionally misappropriating client funds,

Making misrepresentations to the client about such funds,

Making misrepresentations to the District Ethics Committee investigator and the director's office to avoid detection of the misappropriation,

Failing to maintain proper client trust account records,

Failing to supervise the person in his office responsible for maintaining the client trust account records, and

Falsely certifying to the supreme court that such trust account books were, in fact, maintained properly.[1]

---

1. On August 17, 1992, the director filed supplemental charges against respondent. At oral argument, the director requested the court to decide the case solely on the basis of the 1991 petition and to ignore the supplemental petition. Respondent has filed an answer denying the charges in the director's supplemental petition.

A hearing was held on January 2 and 3, 1992, before a court-appointed district court judge sitting as referee. On January 30, 1992, the referee issued his findings of fact, conclusions of law, and a recommendation for disbarment. Because the referee recommended disbarment, respondent was suspended from the practice of law pending completion of the disciplinary proceeding pursuant to Rule 16(e), Rules on Lawyers Professional Responsibility (RLPR).

On March 9, 1992, respondent filed a certificate as to transcript pursuant to Rule 14(e), RLPR. Respondent is thus legally entitled to and does contest several of the referee's factual findings and conclusions that the misappropriation and misrepresentations were intentional. Respondent asks that he not be disbarred, but, instead, be immediately reinstated to the practice of law. We affirm the referee's findings and recommendation for disbarment.

The underlying facts are as follows:

In the early 1980's, respondent hired his wife Mary to be his office manager. Her delegated duties included maintaining separate accounts for business expenses, personal costs, and client funds. The referee found that respondent failed to maintain proper client trust books since at least 1988 and failed to supervise Mary properly in her maintenance of these books in violation of Minn.R.Prof. Conduct 1.15(g), 5.3(b), and 8.4(c). Respondent does not dispute these findings.

Despite failing to maintain trust account books, respondent annually certified to the supreme court that he did, in fact, maintain proper trust account books. Respondent now admits that those certifications were false, but disputes that his false certification was intentional. Respondent argues that his certifications were based on information supplied to him by Mary, that he relied on Mary for this information, and that he did not check to see if the information was correct. The referee stated that it is immaterial whether the false certifications were intentional for respondent's actions to be a breach of professional responsibility.

The referee found that respondent misappropriated $16,177.66 from trust accounts of his clients, James and Ellen Auger, in violation of Minn.R.Prof. Conduct 1.4, 1.15(a), (b)(3), (e), 8.4(c). Respondent admits commingling the money with his personal funds, but denies that he intended to misappropriate the Auger funds. He argues instead that Mary transferred the funds without his knowledge. He also states that the Augers agreed to his use of the money as a retainer against attorney fees and that he repaid the Augers when he learned of the wrongful transfers. The referee rejected respondent's contentions that he did not have personal knowledge of the misappropriation and that the Augers consented to the transfers.

The referee also found that respondent made intentional misrepresentations to the Augers about his use of the funds and that respondent intentionally submitted false answers and documents to the District Ethics Committee and the director's office pursuant to their investigation of the Auger's complaint in violation of Minn.R.Prof. Conduct 8.1(a), 8.4(c), 8.4(d). The referee found that such actions amounted to an intentional cover-up of the misappropriation.

Respondent admits to the referee's finding that he made false statements, but denies they were intentional and that he conducted an intentional cover-up. He states again that he was relying on information provided by his wife Mary and that he was not aware of the falsity of the information. Although the referee allowed that respondent may have lacked initial knowledge of the misappropriation, he rejected the respondent's complete denial of knowledge by finding that respondent must have gained knowledge of the misappropriation at least by the time he answered the director's investigation in November 1990.

The referee ruled that respondent's intentional misappropriation and subsequent misrepresentations should result in disbarment. In order to understand fully the underlying facts, we incorporate herein by reference and attach as Appendix A the referee's findings.

The issues raised on appeal are:

Should the referee's findings that respondent's misappropriations and misrepresentations were intentional be overturned as being clearly erroneous?

What is the appropriate discipline for a lawyer found to have intentionally misappropriated client funds and subsequently made intentional misrepresentations about the misappropriation to his client, the director, and the supreme court?

Respondent admits that the Auger funds were misappropriated and that he subsequently made misrepresentations about the misappropriation. Respondent also admits that he failed to supervise his wife's maintenance of the client trust accounts and that the office failed to keep proper client trust accounts since at least 1988. Respondent challenges, however, the referee's findings that the misappropriation of and misrepresentations about the client funds were intentional and argues that the director failed to prove by clear and convincing evidence that the misappropriation and misrepresentations were intentional. Instead, respondent states that he was unaware that his wife Mary had transferred the funds into his business account and further states that he provided the false statements and documents because of information given to him by Mary.

Respondent is correct that the standard of proof for attorney discipline cases is "clear and convincing evidence," see In re Schmidt, 402 N.W.2d 544, 545 (Minn.1987), but the standard of review for attorney discipline cases is to uphold the referee's factual findings if they are not clearly erroneous, In re Pyles, 421 N.W.2d 321, 325 (Minn.1988), or if they are supported by the evidence. Schmidt, 402 N.W.2d at 545. In other words, this court is to uphold the referee's findings that respondent intentionally misappropriated the client funds and intentionally misrepresented the status of those funds unless the court finds that the referee's findings are unsupported by the evidence.

Respondent urges that this court adopt a narrow definition of misappropriation, i.e., that misappropriation occurs only when a lawyer consciously intends to remove trust funds and use them for a purpose other than specified by the client. Respondent's position is not the law in Minnesota. "Misappropriation occurs whenever funds belonging to a client are not kept in trust and are used for any purpose other than that specified by the client." In re Isaacs, 451 N.W.2d 209, 211 (Minn.1990). In Isaacs, the court acknowledged a lack of direct evidence that the attorney had intentionally misappropriated his client's funds, but still ordered disbarment because of repeated misappropriations. Id. In this case, respondent admits that client funds were removed from the trust account, so the referee was correct to find misappropriation unless such removal was specified by the Augers.

Respondent argues that his client did, in fact, consent to respondent's use of the funds in the trust account as the method for respondent to receive his fees. Respondent refers to a letter from his client asking "how much we have left with the money that you and the mortgage company are holding," suggesting that Mr. Auger gave at least general authorization for the withdrawal of fees from the trust account.

The referee rejected this inference and held that Mr. Auger did not authorize respondent's use of the funds. The referee stated that the fact that respondent told Mr. Auger that he would be charging no more than $2,198.27 without further authorization contradicts respondent's assertion that Mr. Auger gave authorization to make personal use of the entire trust account balance of $16,177.66. Further, Mr. Auger's October 1990 letter of complaint to the Lawyer's Professional Responsibility Board and his previous communications with respondent seeking to find out how much money is in the trust account seem to suggest that, even if at one time Mr. Auger did authorize respondent's use of the trust account funds, such authorization was no longer operative. If respondent was not authorized to use the funds in the trust account, then he has misappropriated the funds under Minnesota law.

The referee also found that respondent's misappropriation was knowing and intentional. The referee stated that respondent's contention that he did not acquire knowledge of the misappropriation by the time of the investigation is "simply not believable." The referee also found that respondent had engaged in a cover-up of the misappropriation. The referee rejected respondent's arguments that his wife misappropriated the money and then concocted the cover-up without his knowledge. On appeal, respondent argues that no direct evidence was produced to prove his knowledge of the misappropriation. We reject this argument because, in attorney discipline cases, often the only direct evidence available is that known by the attorney. Since the referee's findings were not clearly erroneous, they shall stand.

We have consistently adopted strict disciplinary measures for lawyers found to have misappropriated client funds. Last year, this court stated that it has noticed an increasing amount of trust account violations and advised the bar that "misuse of trust accounts in the future will (1) almost invariably result in lengthy suspension at the very least and disbarment at worst and (2) that retainer fees not immediately placed in a trust account will be looked upon with suspicion." *In re Lochow*, 469 N.W.2d 91, 98 (Minn.1991).

The referee recommended that respondent be disbarred. A referee's recommendation is entitled to great weight, but the final responsibility for determining sanctions rests with the supreme court. *Pyles*, 421 N.W.2d at 325. Disbarment is the usual discipline for attorney misappropriation of client funds except in instances when the attorney presents clear and convincing evidence of substantial mitigating circumstances which show that the attorney did not intentionally convert the funds. *In re Parks*, 396 N.W.2d 560, 562 (Minn. 1986); *In re Fling*, 316 N.W.2d 556, 558 (Minn.1982). Respondent's argument that he did not intentionally convert the funds was rejected by the referee, and no evidence was produced on appeal to show that the referee's finding was clearly erroneous.

The referee considered respondent's other evidence of mitigation, including his pro bono work and his service as a family court referee, but determined that the severity of his actions outweighed the evidence of mitigation.

In addition to finding that respondent misappropriated client funds, the referee found that respondent made intentional misrepresentations to the director about the misappropriations. We should not hesitate to impose severe discipline when a lawyer demonstrates a lack of truthfulness and candor to the officers of the judicial system. *Schmidt*, 402 N.W.2d at 548. Misrepresentations to the director about the maintenance of trust accounts become even more egregious when in conjunction with violations of other rules. *Lochow*, 469 N.W.2d at 99. In this case, the referee found intentional misappropriation in conjunction with intentional misrepresentations to the client and the director in order to cover up the misappropriation.

The referee also found that respondent failed to maintain proper trust account procedures, failed to supervise adequately the person responsible for maintaining the trust accounts, and falsely certified to the supreme court that he did, in fact, maintain proper trust account books. Respondent does not dispute these findings, but states that he had a good-faith belief that his trust accounts were properly kept.

"Every lawyer is * * * charged with the knowledge that he must maintain a separate account and adequate records." *Matter of Shaw*, 298 N.W.2d 133, 135 (Minn.1980). Failure to be aware of trust account violations is not a mitigating factor because the attorney has the duty to certify that the requirements have been met. *In re Porter*, 449 N.W.2d 713, 718–19 (Minn.1990). Improper maintenance of trust accounts by itself is generally sufficient to warrant suspension. *Id.*

Accordingly, when the findings of the referee are studied as a whole, disbarment is the only appropriate sanction.

IT IS SO ORDERED.

APPENDIX A

File No. C0–91–1953

STATE OF MINNESOTA

IN SUPREME COURT

In Re Petition for Disciplinary Action against Arthur W. LaChapelle, an Attorney at Law of the State of Minnesota.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

Filed Feb. 3, 1992.

The above-entitled matter was heard on January 2 and 3, 1992, by the undersigned, acting as referee by appointment of the Minnesota Supreme Court. Martin A. Cole, Senior Assistant Director of the Office of Lawyer's Responsibility (Director). Michael J. Hoover, Esq., appeared on behalf of Respondent Arthur W. LaChapelle, who was present throughout the proceedings.

Based upon the entire file and record of proceedings herein, the undersigned makes the following:

## FINDINGS OF FACT

### I.

Respondent was admitted to practice law in Minnesota in 1978. He is not licensed in any other state court. Respondent currently practices law as a solo practitioner in St. Paul, Minnesota.

### II.

Mary LaChapelle, Respondent's wife, was the office manager and bookkeeper for Respondent's law practice from the early 1980's until April 1991. Mrs. LaChapelle had no training for these functions except that provided by Respondent.

### III.

Respondent delegated all of the money handling responsibilities associated with his practice to his wife, including the handling of his trust account. With respect to his trust account, Respondent intentionally set up a system whereby he signed blank checks and then allowed his wife to transfer funds without his supervision.

### IV.

Beginning in October 1989, Respondent began representing James and Ellen Auger on the sale of their property in White Bear Lake, Minnesota. The Augers had already purchased a home in Oklahoma and would not be present at the closing of their White Bear Lake property. The Augers paid Respondent a $300.00 advance fee. The $300.00 was for the preparation of powers of attorney, the review of documents, the signing of documents, the accepting of funds and the sending of those funds to Mr. and Mrs. Auger in Oklahoma.

### V.

The closing occurred on December 12, 1989, with the buyers taking possession of the property. Due to a defect in the Augers' title, $3,000.00 was escrowed with Universal Title Company. Respondent agreed to clear title or handle a Torrens registration for the property. Respondent discussed fees with Mr. Auger at that time, but nothing was put in writing nor was a particular fee agreement reached.

### VI.

At the closing, Respondent received a check for the balance of the Auger's equity in their property, $16,177.66, payable to Respondent as attorney in fact for the Augers. On December 13, 1989, Respondent caused the Auger funds to be deposited into his law office trust account.

### VII.

On Respondent's advice, Mr. Auger agreed that Respondent would retain the $16,177.66 until the title problem was resolved. Respondent did not place the Auger money in a separate account for the Augers' benefit. Through a series of transfers from December 1989 to early February 1990, Respondent transferred $13,670.00 of the Augers' funds from his trust account to his law office business account. Respondent signed each of the trust account checks used for these trans-

fers, which were annotated with the Augers' name. These transfers were made without the knowledge or consent of the Augers.

### VIII.

Respondent used the funds to pay business or personal expenses. Respondent had considerable debts and obligations as of December 1989, including an IRS lien and two employees to whom considerable unpaid wages were owing. In addition, in August 1989, Respondent had obtained a $5,000.00 loan from First Bank. The loan was payable in full on November 29, 1989. The loan remained unpaid as of December 13, 1989, when the Auger funds were deposited into Respondent's trust account.

### IX.

On December 15, 1989, $1,000.00 of Auger funds was transferred from Respondent's trust account to his business account. On December 18, 1989, $5,000.00 of Auger funds was transferred from Respondent's trust account to his business account. At no time prior to these deposits had Respondent's business account balance been in excess of $5,000.00 since August 31, 1989, which was two days after Respondent received the $5,000.00 bank loan. On December 19, 1989, Respondent's $5,000.00 loan was repaid to First Bank from the Auger monies.

### X.

By early February 1990, $2,502.23 of the Auger money remained in Respondent's trust account. Thereafter, Respondent's trust account balance often was below $2,502.23. The remaining Auger funds were transferred to Respondent's business account and used for business or personal expenses.

### XI.

In February 1990, in corresponding with Mr. Auger, Respondent indicated to Mr. Auger that he had earned a fee plus costs of $2,198.27 on work he had performed in clearing title to the Augers' property. Respondent also indicated to Mr. Auger that he had not collected any of that fee from the $16,177.66 which was presumably in a separate trust account earning interest. In addition, Respondent indicated that he would not charge Mr. Auger any more than the $2,198.27 already earned without Mr. Auger's approval. The Auger's never gave their approval nor did Respondent seek approval to charge any more than that amount.

### XII.

On or about November 16, 1990, Respondent received an $18,000.00 check from Clarence Larson, another client of Respondent's, which was for fees already earned. With this check, on November 16, 1990, Respondent opened account number 557065–63 at Como Northtown Credit Union, in Respondent's own name, in the amount of $17,467.98. Respondent received the remainder, $532.02, in cash. The purpose of this account was to make restitution of the Auger money.

### XIII.

In January, 1991, Respondent closed the Como Northtown account and placed $16,-246.51 into a 30–day renewable certificate of deposit in the Augers' name with Respondent as attorney in fact. Respondent wired $1,200.00 to the Augers at that time. In April 1991, Respondent wired the remaining $16,344.67 (which included additional interest) to the Augers.

### *False Statements to Mr. Auger and to the Disciplinary Authorities*

### XIV.

On several occasions throughout 1990, Mr. Auger, who had cancer and was extremely ill (and who is now deceased), called or wrote to inquire as to the status of his funds. Respondent informed Mr. Auger that the money was in an account drawing interest. These statements were false. Respondent did not provide Mr. Auger with any written accounting during this time to verify his statements.

## XV.

In October 1990, Mr. Auger filed a complaint with the office of Lawyers Professional Responsibility, which was forwarded to Respondent on or about November 8, 1990. Respondent's answer to the district ethics committee investigator was due November 23, 1990.

## XVI.

On November 23, 1990, Respondent submitted an answer to the district ethics committee investigator. In that answer, Respondent represented that the Como Northtown account had been opened on January 2, 1990, and that the Auger funds had earned $1,098.75 in interest to date. Respondent admits these statements were false. Respondent also provided to the investigator copies of trust account client subsidiary ledgers for the Auger funds. These ledgers were in fact created by Mrs. LaChapelle on or before November 23, 1990, and Respondent admits they were false.

## XVII.

On March 19, 1991, Respondent was requested by the Director's Office to provide original records relating to the Como Northtown account, including bank statements and the original deposit ticket. On March 29, 1991, Respondent stated that Como Northtown does not produce statements on such accounts and that the original deposit ticket as well as Respondent's only copy of that deposit document had been sent to Mr. Auger in February 1990. These statements were false.

## XVIII.

Respondent claims that he relied on false statements provided to him by his wife. While it is believable that Respondent did not have personal knowledge of the initial misappropriation of funds, Respondent's lack of knowledge becomes unbelievable beginning some time in November. The sequence of events which occurred from November 8, 1990 through April 1991 are such that lead to only one conclusion. That conclusion is that Respondent gained direct knowledge of the misappropriation and tried to cover it up. He intentionally provided false information to the Director in order to conceal what he or his wife had done.

### *Failure to Maintain Books and Records and False Certification*

## XIX.

Respondent admits that he failed to maintain law office trust account books and records as required by Rule 1.15, Minnesota Rules of Professional Conduct (MRPC), and Lawyers Professional Responsibility Board Amended Opinion No. 9. Specifically, Respondent admits that he has not maintained updated trust account client subsidiary ledgers since approximately 1984, and that he has not performed monthly reconciliations or trial balances of his trust account.

## XX.

Respondent delegated substantial authority for maintaining his law office trust account books and records to his wife and office manager, Mary LaChapelle. Respondent admits that he failed to adequately supervise Mrs. LaChapelle's record keeping.

## XXI.

Since at least 1988, Respondent annually certified to the Minnesota Supreme Court on his attorney registration form that he has maintained trust account books and records in compliance with Rule 1.15 and Opinion No. 9. Respondent admits that the certifications were false.

### *Respondent's Mitigation*

## XXII.

Respondent has no prior disciplinary history.

## XXIII.

Respondent has worked as a conciliation court referee, as an arbitrator, as a mediator and as a hearing examiner. He has

handled many *pro bono* or reduced fee matters and has participated in many civic activities and teaching activities in his community.

XXIV.

Respondent presented evidence from four character witnesses who testified that, in their opinion, Respondent was honest and truthful and that, in their opinion, it was inconsistent with the Respondent they knew to intentionally misappropriate client money. On cross-examination, these witnesses collectively admitted it was also inconsistent with the Respondent they knew to be so negligent, as Respondent claims to be, that he would not be fully aware of the status of his trust account.