In re the Petition for DISCIPLINARY ACTION AGAINST David A. PYLES, an Attorney at Law of the State of Minnesota.

No. C4–87–395.

Supreme Court of Minnesota.

April 1, 1988.

---

William J. Wernz, Director, Lawyers Professional Responsibility, Candice M. Hojan, Sr. Asst., St. Paul, for appellant.

Theodore J. Collins, St. Paul, for respondent.

PER CURIAM.

The referee appointed by the court in this lawyers disciplinary action found that respondent David A. Pyles had violated rules of professional conduct applicable to lawyers: by misappropriating client funds

on three separate occasions; by making a false representation to a client; by failing to maintain adequate financial records in his law practice and falsely certifying to this court that he had; by handling a matter when he had a conflict of interest with a client; and by failing to timely file income tax returns. The referee rejected Pyles' mitigation assertion that during the relevant times he was "suffering from severe depression and psychological problems which were the cause of the conduct." The referee recommended disbarment as the appropriate discipline. While we acknowledge that the nature and extent of the misconduct and the absence of an established mitigation defense ordinarily would warrant the recommended disbarment, due to special circumstances in this case, we conclude that the goal the referee had in mind—protection of the public—can best be substantially served by imposing the sanction of indefinite suspension.

The Director's original petition seeking disciplinary sanctions charged that respondent had misappropriated client funds, had misappropriated escrowed funds, had made misrepresentations to conceal those misappropriations, had failed to keep adequate trust account records and had made false certifications relative thereto. In a subsequent disciplinary petition, the Director alleged that respondent had undertaken representation of a client with whom he had a conflict of interest and that he had failed to file timely income tax returns. Respondent, in his answer, generally admitted the allegations of both petitions with one exception. He denied that investment advice given a client violated any disciplinary rule governing a lawyer's conflict of interest with a client. With that sole exception, respondent's defense was one claiming mitigation because, he claimed, at the time the violations occurred he was experiencing severe psychological problems which were the cause of his conduct. The referee's fact findings which generally substantiated the allegations of the petition are summarized below.

1. *Misappropriation:*

(a) By his will John Davis devised two-thirds of his estate to a sister with the remainder to his church. In 1986, during the course of probating the Davis estate, respondent received approximately $45,000 of funds belonging to the estate. He deposited those funds in his office trust account. Thereafter those deposited funds were not only wrongfully used to repay other clients whose trust funds had been misused, but also were misappropriated for the respondent's own personal and family use. Ultimately, sufficient funds were returned to the trust account to replace the misappropriations so that in the end the Davis estate suffered no loss.

(b) In the same year, while acting as an escrow agent in a real estate transaction involving a client, respondent deposited approximately $15,000 in his trust account. He likewise misappropriated a portion of those funds to his own personal use, and disbursed some of the funds to others without proper prior authorization. As with the Davis funds, those funds were eventually returned, but not until after these disciplinary proceedings were instituted. These misappropriations by the respondent violated Rules 1.15(a), (b)(4); 8.4(b), (c), Minnesota Rules of Professional Conduct (MRPC).

2. *Misrepresentation:* The attorney for a real estate vendor who was entitled to escrow funds being held by respondent requested disbursement of the funds. For more than a month thereafter, though repeatedly promising to remit, respondent failed to do so. In fact he was unable to do so because the escrowed funds had been misappropriated and the trust account closed. After three more months had passed, the contract vendor, who had not yet received the escrowed money due him, made a complaint to the Lawyers Board on Professional Responsibility. Respondent initially falsely represented to the Director's office that he had a cashier's check for the amount due the vendor, when, in fact he had no check. Only later did respondent acknowledge that the vendor's money was neither in his trust account nor represented by a certified check. The misrepresentations made to the vendor's attor-

ney violated Rules 4.1 and 8.4(c), MRPC. His misrepresentation to the Director violated Rules 8.1(a)(1) and (3), MRPC as well.

3. *Inadequate Trust Account Records:*

(a) Since July 1, 1983, all practicing lawyers in Minnesota have been required to maintain an "Interest on Lawyers Trust Account" (IOLTA). Though respondent maintained an IOLTA, during four of the first six months of 1986 the account had negative balances, had overdraft charges, and showed at least six checks returned for insufficient funds. This account was ultimately closed in July 1986.

(b) From October 1985 through September 1986, respondent and another attorney maintained an IOLTA in a Hopkins bank. In July and August 1985 that account had overdrafts and two checks were returned for insufficient funds. No funds from this account were ever paid over to the Lawyers Trust Account Board. Money from both accounts was used by respondent to meet his other financial obligations. Shortages in IOLTA accounts and failure to remit trust funds violated Rules 1.15(a), (b)(3), (b)(4), (c), (d), (e), 8.4(b), (c), MRPC.

(c) As a practicing attorney respondent was required to maintain an accounting system that provided for a monthly reconciliation of statements with client subsidiary ledgers, and annotation of checks and deposit tickets sufficient to establish whose funds were in trust. DR 9–104(A), Minnesota Code of Professional Responsibility (MCPR), and after September 1, 1985, Rule 1.15(g), MRPC. Although respondent failed to maintain a complying system, in both 1985 and 1986, he did falsely certify to this court that he had in violation of DR 1–102(A)(4) and DR 9–104(B), MCPR, and, after September 1, 1985, Rules 8.4(c) and 1.15(h), MRPC.

4. *Conflict of Interest:* While representing clients named Lundgrens, respondent suggested to them that they invest

funds in one of his corporate clients' firms. At the time respondent made the suggestion he knew that at least four corporate checks which had been issued to him had been dishonored upon presentation for payment. The Lundgrens subsequently did invest funds in the corporation—a portion of which came back to the respondent as attorney fees for representation of the corporation in securing refinancing. Respondent disputed the Director's claim that he had failed to make a sufficient disclosure to the Lundgrens of the nature and extent of his connection with the corporate client and of the risk of investing in the corporation. Notwithstanding respondent's assertion, there exists sufficient credible evidence to sustain the referee's finding that the respondent's conduct violated Rules 1.7(b) and 8.4(c), MRPC.[1]

5. *Income Taxes:* Respondent had sufficient income to require that he file federal and state income tax returns for the years 1981 through 1983. He failed to file those returns until August of 1984. Beyond taxes which had been withheld or paid on estimates, no taxes were due for those years. His 1985 returns were filed when eight months past due, and after the Director's petition for disciplinary action had been filed. On the day of the referee hearing, that tax, interest, and penalty were paid. Prior to September 1, 1985, respondent's failure to file those returns violated DR 1–102(A)(5) and (6), MCPR, and thereafter Rule 8.4(d), MRPC, and our holding in *In re Bunker*, 294 Minn. 47, 199 N.W.2d 628 (1972).

6. *Mitigation:* As mitigation excusing the misconduct, the respondent contends that the various instances of misconduct were the direct result of a psychological disability. One advancing such a claim has the burden of establishing by clear and convincing evidence each of the five re-

1. Rule 1.7(b) MRPC reads:
   A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
   (1) the lawyer reasonably believes the representation will not be adversely affected; and
   (2) the client consents after consultation. * * *

quirements outlined in *In re Weyhrich*, 339 N.W.2d 274 (Minn.1983).[2]

The referee made four key findings relative to respondent's mitigation claim. First, he acknowledged that respondent had psychological difficulties in the nature of an adjustment disorder, but observed that that type of disorder is not a "severe" problem on a recognized psychological diagnostic scale and "did not result in impairment of respondent's cognitive functions, his ability to direct his actions, or to know right from wrong." Secondly, although acknowledging that respondent's adjustment disorder "may have contributed in some way" to respondent's financial problems, the referee noted that respondent knew he was wrongfully taking client funds, and that personal financial reverses and poor investment choices were the immediate cause of respondent's misappropriations. Thirdly, the referee acknowledged that respondent was undergoing counseling but observed that continuation of the counseling was indefinitely indicated into the future. Implicit in that finding was that up until the time of the hearing there had been insufficient recovery to arrest the conduct. Lastly, the referee opined that respondent's misconduct appears to have been arrested, if at all, more by the discovery and subsequent investigation by the Director's office than by any psychological counseling.

The referee thus concluded that respondent had failed to show by clear and convincing evidence that he had satisfied any of the five Weyhrich requirements—except that he was undergoing treatment and making progress toward recovery.

◼ All of the referee factual findings, on the mitigation issue, as well as the misconduct issues, and the conclusions drawn from those facts, are adequately supported by credible evidence and cannot be said in any respect to be clearly erroneous. Therefore, we affirm them. *In re Schmidt*, 402 N.W.2d 544, 545 (Minn.1987);

*In re Simmonds*, 415 N.W.2d 673, 675 (Minn.1987).

◼ The more difficult question is the determination of the appropriate discipline to be imposed. Although historically we have considered that a referee's disciplinary recommendation is entitled to great weight, we have recognized that the final responsibility for determining appropriate sanctions rests with this court. *In re Fling*, 316 N.W.2d 556, 559 (Minn.1982); *In re Daly*, 291 Minn. 488, 490, 189 N.W.2d 176, 179 (1971). We exercise that responsibility by weighing the nature of the misconduct, the cumulative weight of the disciplinary rule violations, and the potential harm to the public, to the legal profession, and to the administration of justice. *In re Agnew*, 311 N.W.2d 869, 872 (Minn.1981); *In re Franke*, 345 N.W.2d 224, 228 (Minn. 1984). Concepts of fairness dictate that consistency in the imposition of sanctions be an important goal in meting out disciplinary sanctions. However, we recognize that each case comes to us bearing its own unique factual circumstances. By analogy prior decisions are helpful to us in arriving at the appropriate sanction. However, on occasion, unusual or special circumstances may justify some deviation from the holdings of those precedents. *See In re Gubbins*, 380 N.W.2d 810, 812 (Minn.1986).

◼ In this case, ample precedent supports the referee's recommendation that the sum of the various elements of Pyles' misconduct warrants disbarment. The misappropriation, considered alone, ordinarily furnishes sufficient grounds. *See, e.g., In re Parks*, 396 N.W.2d 560, 562 (Minn.1986). When multiple acts of misconduct similar to those committed by Pyles have been present disbarment likewise has been considered appropriate. *See In re Selb*, 395 N.W.2d 81, 82 (Minn.1986); *In re Jones*, 383 N.W.2d 303, 306–307 (Minn.1986); *In re Shaw*, 298 N.W.2d 133, 135 (Minn.1980). Strict adherence to precedent in this case would mandate disbarment—unless unique

2. The five requirements are: (1) that he has a severe psychological problem; (2) that the psychological problem was the cause of the misconduct; (3) that he is undergoing treatment and making progress to recover; (4) that the recovery process has arrested the misconduct; and (5) that the misconduct is not likely to recur. 339 N.W.2d at 279.

circumstances exist permitting imposition of a slightly lesser sanction which would provide protection to the public substantially similar to that provided by disbarment.

No rational distinction exists between the facts and circumstances of the present case and those found in our precedents that, if just considered in a vacuum, would permit such a deviation. But where those facts are considered in conjunction with what the referee thought was an appropriate type of sanction, as explained by him in his memorandum appended to the disbarment recommendation, indefinite suspension from the general practice of law substantially comports with, and affords substantially the same protection to the public as, the protection the referee sought.

Outside of his profession, as the referee observed, "it is clear that the respondent has led an exemplary life." For years he has been active in, and devoted many unpaid hours to the religious affairs of his church by willingly undertaking all types of tasks, from performing the most menial to filling some of the highest positions of lay authority. His entire nonprofessional life has demonstrated his care and concern for the less privileged. Typically, in addition to generally attending to the needs of the underprivileged, he often rendered professional services for which he received no fees or fees considerably smaller than those appropriate for the services rendered. The rendition of this professional pro bono type work had a detrimental effect on his own personal and family finances. When that happened, he began to misappropriate client funds.

The psychologist who had examined Pyles on behalf of the Director, and another psychologist who had been counseling with Pyles both diagnosed Pyles as having a psychological adjustment disorder. Both seemingly agreed that in his own mind Pyles had rationalized the behavior constituting the misconduct as being justifiable because of the existence of what one psychologist characterized as a "Messianic" complex and the other psychologist as a "Robin Hood" complex. Both agreed that while Pyles knew, at the time, that what he was doing was morally and ethically wrong, he justified his actions by what he considered a superseding moral ethic—to-wit, to aid the underdog.

Nevertheless, even if it be conceded that Pyles' misconduct was not motivated by avarice nor for personal, social or financial aggrandizement, the conduct was intentional and, as the referee appropriately found, not the cause of this egregious conduct. At most, the psychological adjustment disorder explains respondent's conduct, but even so, until continuing psychological counseling has reached the point that it can be clearly and convincingly established that respondent is no longer obsessed with that "Messianic" complex, he cannot be permitted to engage in the general law practice.

Adoption of the referee's disbarment recommendation, as noted, would not only serve the end of protecting the public, but also would be consistent with our precedents. Normally it would be the appropriate discipline. Disbarment, however, is not only the most drastic disciplinary sanction, but also, as our recent disciplinary history demonstrates, it is ordinarily final. Reinstatement following disbarment is practically nonexistent.[3]

In a memorandum appended to his recommendation, the referee opined that sometime in the future respondent might be a candidate for reinstatement.[4] That comment leaves us in doubt as to whether he appreciated the practical finality of disbarment. Nevertheless, as indicated, the record does support the referee's observation that sometime in the future Pyles might be a candidate for reinstatement. Meanwhile, by indefinitely suspending respondent we can serve the interest of the public protection, but yet not completely

---

**3.** A cursory research of the attorney disciplinary process over the past two decades reveals only one instance when reinstatement after disbarment was granted.

**4.** The referee observed: "Although disbarment is being recommended, it appears that respondent is now taking substantial steps toward rehabilitation and might well in the future be a candidate for reinstatement."

foreclose all possibility of his future reinstatement to the unrestricted practice of law.

Since 1986 respondent Pyles has not been engaged in the general practice of law. Most recently he has tried to support himself and his family either by working for a salary as a real estate title examiner or by rendering title opinions as an independent contractor to other title companies. As long as those types of services do not involve the rendition of legal services or the giving of legal advice to clients on a fee basis nor the handling of client moneys, they pose no threat to the public. We can perceive of no reason, except retribution itself, why respondent should not be permitted to continue in that very limited concept of the practice of law.

Accordingly, we herewith order respondent's indefinite suspension from the general practice of law, or any limited practice of law, that involves the rendition of legal services or advice to clients for a fee, or otherwise, or which involves the handling of any moneys belonging to any person to whom he gratuitously renders service or gives advice, provided, however, that this suspension shall not bar respondent from rendering legal services in the nature of title examination for title companies so long as said services do not involve the handling of client moneys. It is further ordered that respondent may not petition for reinstatement to the general unrestricted practice of law before a date occurring more than two years from the date of this order, and then only upon compliance with all provisions of Rule 18, Rules on Lawyers Professional Responsibility.[5]

---

5. Upon petition for reinstatement, and in compliance with Rule 18, Pyles must, among other requirements, successfully complete written examinations required of applicants for admission to the practice of law in this state, including the written exam on the subject of professional responsibility, and satisfy requirements for Continuing Legal Education. Additionally, Pyles must prove to this court, by clear and convincing evidence, that he has fully overcome his psychological disability. *See In re Weyhrich*, 339 N.W.2d 274 (Minn.1983).