In re Petition for DISCIPLINARY AC-
TION AGAINST James O. SHOEMAK-
ER, an Attorney at Law of the State of
Minnesota.

No. C6–92–2468.

Supreme Court of Minnesota.

June 30, 1994.

Marcia A. Johnson, Director, Lawyers'
Professional Responsibility Bd., Martin A.
Cole, Sr. Asst. Director, St. Paul, for appel-
lant.

Michael J. Hoover, Minneapolis, for re-
spondent.

## OPINION

PER CURIAM.

On December 14, 1992, the Director of the
Office of Lawyers Professional Responsibility
filed a petition for disciplinary action against
respondent James O. Shoemaker alleging

misappropriation of client and law firm funds, falsification of trust account records, and failure to report the misappropriated funds as income on state and federal tax returns. In his answer to the Director's petition, respondent admitted these violations but claimed that depression, anxiety, and other psychological problems contributed to his misconduct. Respondent was temporarily suspended from practice on December 17, 1992.

Referee Russell A. Anderson conducted a hearing on September 9, 1993 and issued his Findings of Fact, Conclusions of Law, and Recommendation on September 28, 1993. The referee found that respondent, age 38, was admitted to the practice of law in October 1987. In March 1988 he was employed as an associate attorney in the Anderson Law Office in Le Sueur, Minnesota. His starting salary was $26,500. It had increased to $32,000 when he left the firm in July 1992. Respondent's wife taught in the public schools, earning $22,000 to $25,000 per year. Respondent represented clients in general practice, including business, family, workers' compensation, bankruptcy, employment, real estate, personal injury, and estate planning matters. He was active in professional organizations and community activities.

Between October 1989 and July 1992, respondent misappropriated $75,981.99 from the Anderson Law Office and its clients. The loss was not discovered until respondent had left the firm. The referee found that most of the misappropriations occurred when respondent negotiated client fee checks made payable to him personally, even though he was required to turn over all attorney fees and costs received from clients to the firm. In one instance, respondent received a check for $4,513.25 on behalf of a client. Although respondent was supposed to use this money to pay a debt owed by the client's former husband and the client's attorney fees and then distribute the remainder to the client, he took the check to the bank, had a cashier's check issued to the client for her share of the funds, and misappropriated the remainder. Respondent then paid the ex-husband's debt with a trust account check thereby creating an overdraft in the firm's trust account.

In another instance, respondent issued a $7,067.01 check on the firm's trust account payable to a workers' compensation client of the firm. There were, however, no funds in the trust account in which the client had an interest. Nonetheless, respondent had the client endorse the check, accompany respondent to the bank, purchase a money order, and then endorse the money order over to respondent who kept the funds. Respondent falsely advised the client that these actions were necessary to give respondent internal credit for attorney fees generated from his work. On another occasion, respondent issued a $10,400 trust account check to apply against his student loan obligations.

On November 20, 1992, respondent was charged with five counts of theft. These counts later were consolidated into one count of felony theft, Minn.Stat. § 609.52, subd. 2(1) (1992), to which respondent pled guilty. The trial court stayed imposition of sentence for 20 years on the condition that respondent spend 30 days in jail (work release), be confined by electronic home monitoring for 90 days, pay restitution at a rate of not less than $300 per month, continue psychological counseling, and avoid employment with direct access to unmonitored money. In addition, respondent was not to practice law until he completed probation or until further court order. If respondent successfully completes his probation, his offense will be converted into a misdemeanor.

Respondent has no prior discipline record. He is in compliance with the terms and conditions of probation, he has paid restitution of $12,681.99, and he has filed amended state and federal income tax returns for 1990, 1991, and 1992. Respondent currently is employed as a residential mortgage loan originator by OMEGA Mortgage & Finance Corp. where he has worked since October 1992.

The referee found that respondent's conduct violated Rule 8.4(b), (c), and (d) of the Minnesota Rules of Professional Conduct. Although the referee also found that respondent suffers from dysthymia with secondary anxiety, he concluded that respondent had not established a psychological disability by

clear and convincing evidence and recommended that respondent be disbarred. Respondent timely ordered a transcript of the referee's findings and challenges the conclusion that he failed to establish psychological disability as a valid mitigating factor. Respondent also challenges the referee's recommendation of disbarment.

An attorney proffering a psychological problem as a mitigating factor must prove, by clear and convincing evidence, that: (1) the psychological problem is severe; (2) the psychological problem was the cause of the misconduct; (3) the attorney is in treatment and is making progress to recover from the psychological problem that caused or contributed to the misconduct; (4) the recovery has arrested the misconduct; and (5) the misconduct is not likely to recur. *In re Weyhrich,* 339 N.W.2d 274, 278–9 (Minn. 1983).

Respondent satisfies the third, fourth, and fifth *Weyhrich* criteria—he has been in therapy since December 1992, is responding well to treatment, and is unlikely to commit similar misconduct. The issue on appeal is whether the referee erred in concluding that respondent failed to establish the first two requirements—that he suffered from a severe psychological problem that caused the misconduct.

The two experts who testified at the hearing agreed that respondent suffered from dysthymia with secondary anxiety. Dysthymia was described as a low grade depression, characterized by a longstanding depressed mood, low self-esteem, and low energy, that can be a "serious" problem, but is "usually not incapacitating." Based on this testimony, the referee concluded that respondent did not satisfy the first *Weyhrich* requirement because his psychological problems, "while serious, are not severe." Respondent asserts that for purposes of establishing psychological mitigation, the distinction between "serious" and "severe" is immaterial. We disagree and choose to follow our decision in *In re Pyles,* 421 N.W.2d 321 (Minn.1988), where we affirmed the referee's rejection of a psychological mitigation claim because the respondent's "disorder [was] not a 'severe' problem on a recognized psycho-

logical diagnostic scale and 'did not result in impairment of respondent's cognitive functions, his ability to direct his actions, or to know right from wrong.'" *Id.* at 325.

Even if a serious psychological problem were to fit within the *Weyhrich* standard, respondent would still have to prove causation and the record suggests that respondent's dysthymia only vaguely contributed to his behavior. One of the experts who testified at the hearing described respondent's psychological problems as "contributors" to his misconduct. The other expert testified that

> Dysthymia with anxiety * * * is part of [respondent's] makeup. I suspect it's been there from very early on, and so it would have been a part of his motivation [to steal]. * * * I think there are factors that would have contributed. I don't think that it, however, accounts entirely for the behavior, by any means.

This expert further explained that respondent's dysthymia "also would contribute, for example, to [his] success in getting through law school." Thus the record shows little, if any, connection between respondent's feelings of low self-esteem and low energy and his decision to steal client and law firm funds. Since respondent has not proved that his psychological problems are severe or that they caused or significantly contributed to his misconduct, we affirm the referee's finding that respondent failed to establish a claim of psychological mitigation.

In addition to his claim of psychological mitigation, respondent asserts that the following factors warrant leniency in his case—the fact that he has no prior disciplinary record, that he has made partial restitution, that he has cooperated with the Director, that he has been criminally prosecuted for his conduct, and that he is genuinely sorry for his actions. Respondent argues that in light of these facts and the fact that he is making progress in therapy, disbarment "would have the appearance of a purely punitive sanction."

This court gives a referee's disciplinary recommendation great weight, but we

have the final responsibility for determining the appropriate sanction. *In re Pyles,* 421 N.W.2d 321, 325 (Minn.1988). In exercising this responsibility, we weigh the nature of the misconduct, the cumulative weight of the disciplinary rule violations, and the potential harm to the public, to the legal profession, and to the administration of justice. *Id.* We have stated that "concepts of fairness" require consistency in attorney disciplinary sanctions, but have also noted that we will look at the facts and circumstances of each case because "on occasion, unusual or special circumstances may justify some deviation from the holdings of those precedents." *Id.* Respondent argues that the facts and circumstances of his case warrant a sanction less than disbarment and asks us to modify the recommended sanction to continue his indefinite suspension from the practice of law with the right to apply for reinstatement on or after December 17, 1994.

Many of our cases support the sanction of disbarment for attorneys who have misappropriated funds or who were convicted of a felony offense. *See In re Stroble,* 487 N.W.2d 869 (Minn.1992); *In re Dumbaugh,* 445 N.W.2d 534 (Minn.1989); *In re Ray,* 408 N.W.2d 581 (Minn.1987); *In re Hennings,* 283 N.W.2d 896 (Minn.1979). In addition, while we have not disbarred every attorney who has misappropriated funds, the ABA standards recommend disbarment when "a lawyer engages in serious criminal conduct a necessary element of which includes * * * false swearing, misrepresentation, fraud, extortion, misappropriation, or theft * * *." *ABA Model Standards,* Standards for Imposing Lawyer Sanctions 5.11 (1992).

Here, where respondent stole a substantial amount of money by multiple acts over an extended period of time, where respondent concealed the theft by falsifying the firm's trust account ledgers, and where respondent admitted the theft only after he left the law firm and was confronted by one of the partners, we hold that disbarment is the appropriate sanction.

So ordered.