**In re the Application for the DISCIPLINE OF Jerrold M. HARTKE, an Attorney at Law of the State of Minnesota.**

No. C5–86–1996.

Supreme Court of Minnesota.

April 14, 1995.

Rehearing Denied May 12, 1995.

Marcia A. Johnson, Director, Lawyers Professional Responsibility Bd., Patrick R. Burns, Sr. Asst. Director, St. Paul, for appellant.

Jerrold M. Hartke, the Hartke Law Firm, St. Paul, and Jack S. Nordby, Meshbesher, Singer & Spence, Minneapolis, for respondent. .

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition and amended petition with this court, alleging that Respondent, Jerrold M. Hartke, committed professional misconduct warranting public discipline. In the petitions, the Director alleges four counts of improper conduct involving several clients: (1) mishandling of client funds; (2) conflict of interest; (3) continuing pattern of neglect; and (4) failure to honor a fee arbitration. The Honorable Harlan L. Nelson conducted a referee hearing on the petitions on March 17, 18, and 19, 1994. On April 22, 1994 the referee issued his findings of fact, conclusions of law, and recommendation for discipline, recommending suspension for a period not less than three years. Respondent ordered a transcript of the proceedings, thus the referee's findings are not conclusive. Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR).

Respondent was admitted to the bar of Minnesota in October 1968. He is a 58–year–old sole practitioner with a busy, diverse litigation practice. Respondent has been previously disciplined by this court. In 1977 and 1979 Respondent received warnings for failing to adequately communicate with a client and for failing to inform the court he would not file a brief. In 1986 Respondent was admonished for failing to exercise diligence on behalf of a client, and failing to adequately communicate with a client. In 1987 this court publicly reprimanded Respondent and ordered three years probation for failing to keep adequate books and records, making false certifications to the court, commingling client and personal funds, and for neglect of client matters. *In re Hartke,* 407 N.W.2d 671 (Minn.1987). In 1988 Respondent received two admonitions for entering into improper business transactions with a client, and for neglect and failure to communicate with a client. In 1990 this court again publicly reprimanded Respondent and ordered three years probation for failing to ensure that a suspended attorney in his employment did not engage in practice of law, and for failure to keep apprised of the progress of a file entrusted to that employee. *In re Hartke,* 464 N.W.2d 146 (Minn.1990).

■ The first issue before the court is whether the referee's findings are clearly erroneous. *In re Pyles,* 421 N.W.2d 321, 325 (Minn.1988). The court accords deference to a referee's findings when they are based on conflicting testimony or in part on a respon-

dent's demeanor, credibility, or sincerity. *In re Iliff,* 487 N.W.2d 234, 236 (Minn.1992); *In re Ruhland,* 442 N.W.2d 783, 786 (Minn. 1989). Having independently reviewed the entire record, we conclude that the referee's factual findings are supported by the evidence. *In re Schmidt,* 402 N.W.2d 544, 545 (Minn.1987).

■ Respondent represented J.F. in a personal injury action, obtaining a $25,000 settlement on her behalf in November 1987. J.F. was entitled to approximately $10,000 of the settlement, after attorney fees and costs. Upon receipt of the settlement check, the funds were not immediately available to J.F. because, pursuant to *Schmidt v. Clothier,* 338 N.W.2d 256 (Minn.1983), J.F.'s uninsured motorist carrier was entitled to 30 days notice before disbursement.

In order to provide J.F. with immediate money, on November 27, 1987, Respondent and J.F. went to Southview Bank where J.F. executed a collateral assignment of proceeds, enabling Respondent to use the settlement check as collateral for a $23,000 loan to himself. Respondent gave J.F. $5,000 that day and deposited the remainder of the loan proceeds, less loan processing costs, in his business account. The loan proceeds covered an overdraft in Respondent's business account. Approximately 30 days later the bank cashed the $25,000 settlement check, paid Respondent's $23,000 loan, and deposited the remainder of the funds in Respondent's business account. Respondent never deposited any of the J.F. settlement funds into a trust account.

From November 1987 through January 1988, Respondent's business account had insufficient funds to pay J.F. the balance of the settlement owed her, although Respondent maintains he had funds to pay J.F. available from other sources. Respondent eventually disbursed to J.F. all the monies she was due under the settlement, in installments averaging $500.

J.F.'s testimony at the hearing admittedly, is confusing. She maintained, however, that she was not aware the collateral assignment was a loan to Respondent, and she denies asking that her settlement be disbursed in small amounts.

Misappropriation "'occurs whenever funds belonging to a client are not kept in trust and are used for any purpose other than that specified by the client,' * * * even where the attorney did not intend to embezzle the funds." *In re Copeland,* 505 N.W.2d 606, 608 (Minn.1993) (quoting *In re Isaacs,* 451 N.W.2d 209, 211 (Minn.1990)). In *Isaacs,* the court held that even where there was no direct evidence Respondent's misappropriation was intentional, where Respondent's negligent or unintentional misappropriation of trust accounts is a repeated or continuing occurrence, severe sanctions are warranted. 451 N.W.2d at 211–12.

The referee found that Respondent's use of client funds to cover business account overdrafts and other expenses without the knowing consent of his client was "clearly and unequivocally a misappropriation of client funds" in violation of Minn.R.Prof.Conduct 1.15(a), 1.15(b), and 8.4. The referee also found that Respondent failed to promptly disburse J.F.'s settlement proceeds. Minn.R.Prof.Conduct 1.15(b). We conclude that the referee's findings on this issue were not clearly erroneous. We also note that although Respondent maintains the transaction was not motivated by evil intent, the J.F. loan transaction occurred only five months after Respondent was placed on a three year probation by this court. *In re Hartke,* 407 N.W.2d 671 (Minn.1987).

■ Respondent concedes he did not place the J.F. settlement proceeds in a trust account as required by Minn.R.Prof.Conduct 1.15(a). The maintenance of proper trust account records is one of the fundamental responsibilities of a practicing attorney because it is the only method for maintaining the identity of the client's money. *See, e.g., In re Beal,* 374 N.W.2d 715, 716 (Minn.1985). Any other disposition of client funds is an appropriation by the attorney. The referee's determination that Respondent violated Minn.R.Prof.Conduct 1.15(a) was not clearly erroneous.

The referee found that the loan transaction between J.F. and Respondent violated Minn.R.Prof.Conduct 1.8(a), prohibiting an attorney from entering into business transac-

tions with a client unless specific conditions are met.

Minn.R.Prof.Conduct 1.8(a) provides:

(a) [a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

■ Borrowing money from a client is a business transaction requiring the attorney to meet the disclosure requirements of Minn.R.Prof.Conduct 1.8(a). Failure to make disclosure gives rise to an impermissible conflict of interest. *In re Dillon,* 371 N.W.2d 548, 550 (Minn.1985); *In re Pearson,* 352 N.W.2d 415, 419 (Minn.1984). J.F.'s testimony indicates she did not understand the nature of the collateral assignment of proceeds. In addition, the loan transaction was consummated in one day so J.F. had no opportunity to consult independent counsel. Minn.R.Prof.Conduct 1.8(a)(2). There is no evidence that Respondent obtained a separate disclosure and consent from J.F. apart from the collateral assignment of proceeds. Minn.R.Prof.Conduct 1.8(a)(1); Minn.R.Prof.Conduct 1.8(a)(3). Thus, we conclude the referee's finding that Respondent violated Minn.R.Prof.Conduct 1.8(a) and 1.7 was not clearly erroneous.

■ From September 1986 through November 1987, prior to receipt of the settlement check in the personal injury action, Respondent made a series of at least 18 personal loans to J.F. totaling $1,677. There was no formal documentation for at least 13 of these loans.

Respondent maintains that loans to clients are authorized pursuant to Minn.R.Prof.Conduct 1.8(e), and that the lack of proper documentation only disadvantaged him, not his clients. Minn.R.Prof.Conduct 1.8(e) clearly provides that a lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except in very limited circumstances:

(1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter;

(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client; and

(3) a lawyer may guarantee a loan reasonably needed to enable the client to withstand delay in litigation that would otherwise put substantial pressure on the client to settle a case because of financial hardship rather than on the merits, provided the client remains ultimately liable for repayment of the loan without regard to the outcome of the litigation and, further provided, that no promise of such financial assistance was made to the client by the lawyer, or by another in the lawyer's behalf, prior to the employment of that lawyer by that client.

Minn.R.Prof.Conduct 1.8(e). We agree with the referee's finding that the loans to J.F. do not fall within any of the exceptions enumerated in Minn.R.Prof.Conduct 1.8(e). Thus, the referee's finding that Respondent violated Minn.R.Prof.Conduct 1.8(e) and 1.7(b) was not clearly erroneous.

Respondent represented B.A. in an uninsured motorist claim. In November 1991 B.A. was awarded $47,674 in an arbitration hearing. B.A. testified before the referee that he asked Respondent to pay his indebtedness to Norwest Bank and Abbott Northwestern Hospital out of the arbitration award proceeds, and that Respondent told him the bills were paid as requested. In fact, Respondent did not pay B.A.'s bills. B.A. also testified that he never received an accounting in the matter. Respondent denies telling B.A. the Norwest and Abbott bills were paid, and maintains he provided B.A. with an accounting.

The referee found that Respondent produced a handwritten document that he as-

serted was a draft of the accounting provided B.A., however, the draft was inaccurate. It indicated that Abbott Northwestern Hospital was paid $4,441 when in fact it was not. Respondent also provided the Director with a "detailed list" of expenses in the B.A. matter indicating that Meaghan Harper received $2,000 in arbitrator's fees; Respondent's check ledger indicated Harper received only $1,000. Respondent could not produce an accounting signed by B.A.. Consequently, the referee found that Respondent failed to provide B.A. with an accounting stating the outcome of the matter, the remittance to B.A., and the method of determining that remittance as required by Minn.R.Prof.Conduct 1.5(c).

The referee was required to assess the credibility of the witnesses since their testimony conflicted. *In re Getty,* 452 N.W.2d 694, 697 (Minn.1990). We conclude that the referee's finding that Respondent violated Minn.R.Prof.Conduct 1.5(c) was not clearly erroneous.[1]

The referee found that Respondent violated Minn.R.Prof.Conduct 1.8(a) when he sold his wife's used car to B.A. without meeting the disclosure requirements and other applicable conditions of Minn.R.Prof.Conduct 1.8(a). We conclude the referee's finding was not clearly erroneous in this matter.

Respondent made a series of personal loans to B.A., totaling $3,450.00. Again, there was no formal documentation for most of these loans. Moreover, one of the loans was made on December 6, 1991, a time when Respondent actually held funds belonging to B.A. in trust. *See* Minn.R.Prof.Conduct 1.15(b)(4) ("A lawyer shall * * * promptly pay or deliver to the client as requested by a client the funds * * * which the client is entitled to receive."). We conclude that the referee's conclusion that Respondent violated Minn.R.Prof.Conduct 1.8(e) and 1.7(b) was not clearly erroneous.

■ Respondent received a letter from Norwest Bank dated January 20, 1992 demanding payment of a $2,500 settlement Re-

spondent had negotiated on B.A.'s behalf in connection with a disputed balance. The bank threatened to seek a default judgment. Although Respondent's trust account contained $7,669.55 of B.A.'s arbitration award on January 20, 1992, Respondent apparently did not respond to Norwest's demand letter. Norwest contacted Respondent again in February 1992 without success. On March 10, 1992 a default judgment against B.A. was entered for $4,713.53. After the default judgment, Respondent attempted to reestablish the original terms of the settlement, but Norwest declined. By this time, B.A.'s trust account contained only $629.50 and Respondent notified B.A. that there were insufficient funds to pay the settlement. B.A. eventually negotiated his own payment plan with Norwest Bank.

We conclude the referee's finding that Respondent neglected client matters in violation of Minn.R.Prof.Conduct 1.3 and 3.2 was not clearly erroneous.

Respondent also loaned another client $400 while that client's uninsured motorist claim was pending. We conclude that the referee's finding that Respondent violated Minn.R.Prof.Conduct 1.8(e) was not clearly erroneous.

Respondent represented P.L. and S.L. in a personal injury action, negotiating a $35,000 settlement on their behalf. The referee found Respondent received the settlement on July 3, 1992, but delayed disbursement of the entire proceeds until February 19, 1993.

Respondent asserts he provided P.L. and S.L. with a statement of the matter's status, and that the delay resulted from the clients' dispute over payment of medical bills. The referee found that Respondent failed to provide P.L. and S.L. with a written accounting as required by Minn.R.Prof.Conduct 1.5(c), and that Respondent delayed settling all the medical bills resulting from the litigation until February 1993. Respondent could not produce a copy of an accounting signed by the clients, although he produced an unsigned copy.

---

1. We assume the referee intended to cite Minn.R.Prof.Conduct 1.5(c), rather than

Minn.R.Prof.Conduct 1.4(c).

Given Respondent's failure to prove he actually provided the clients with a written accounting, and the fact that the referee's conclusion required a credibility determination, we conclude that the referee's finding that Respondent violated Minn.R.Prof.Conduct 1.5(c) was not clearly erroneous.

On March 4, 1993, a fee arbitration panel directed Respondent to refund a $5,000 fee he had received from a client. On April 21, 1993 a demand for payment of the fee was served on Respondent. Respondent did not pay or otherwise respond to the demand until a complaint was filed with the Office of Lawyer's Professional Responsibility on July 2, 1993. That same day, Respondent offered to pay the $5,000 in two installments—the first in July 1993, the second by the first full week of August 1993. Respondent did not pay the first installment until August 2, 1993. He did not pay the second installment until August 31, 1993; that check was returned for insufficient funds. Respondent did not provide a valid check until September 20, 1993.

We conclude that the referee's finding that Respondent violated Minn.R.Prof.Conduct 8.4(d) and Lawyers Prof. Resp.Board Op. No. 5 was not clearly erroneous.

■ Turning to the appropriate discipline for Respondent, the referee noted several aggravating factors with regard to this proceeding. Specifically, the referee noted Respondent's extensive disciplinary history, Respondent's pattern of deceptive practices while the subject of this disciplinary proceeding, the fact that Respondent is an experienced attorney, and that all of the violations occurred while Respondent was on probation. In mitigation, the referee noted Respondent's extensive, busy practice, and the excellent results he obtains for sometimes difficult clients.

■ This court gives great weight to the recommendation of a referee. *In re Franke*, 345 N.W.2d 224, 228 (Minn.1984). However, it retains final responsibility for determining appropriate sanctions. *Id.* While consistency is a goal, the court examines each case individually and imposes the discipline it believes appropriate based on the unique circumstances of each case. *In re*

*Gubbins,* 380 N.W.2d 810, 812 (Minn.1986). Sanctions are not imposed to punish the attorney, but to protect the public, to guard the administration of justice, and to deter future misconduct. *In re Ruffenach,* 486 N.W.2d 387, 390 (Minn.1992).

■ A lawyer's prior disciplinary history is relevant to determining appropriate sanctions. *Id.* Here, Respondent has a lengthy disciplinary history. Moreover, he was on probation a mere five months when the J.F. matter occurred, and throughout the time he committed the various acts of misconduct that are the subject of this proceeding. ·

Although Respondent maintains that his consistent pattern of neglect is not motivated by malice, the court is deeply troubled by Respondent's blatant and repeated disregard for the Rules of Professional Conduct. "After a disciplinary proceeding, this court expects a renewed commitment to comprehensive ethical and professional behavior." *In re Simonson,* 420 N.W.2d 903, 906 (Minn. 1988). That has not happened here.

■ We look to other cases to give us guidance as to the appropriate sanction. We first note that misappropriation of funds frequently warrants disbarment. *See, e.g., In re Shoemaker,* 518 N.W.2d 552, 555 (Minn. 1994) (citing Standards for Imposing Lawyer Sanctions 5.11 (ABA1992)). Violation of Minn.R.Prof.Conduct 1.8 prohibiting lawyers from entering business transactions with clients also merits serious disciplinary sanctions. *In re Olsen,* 487 N.W.2d 871, 874 (Minn.1992). Similarly, repeated and continued neglect of client matters warrants severe sanctions, absent mitigating circumstances. *See, e.g., In re Logan,* 442 N.W.2d 312, 316 (Minn.1989); *In re Chmelik,* 203 Minn. 156, 280 N.W. 283 (1938).

This court has deemed indefinite suspension warranted in cases similar to the one before the court. In *In re Pokorny,* 453 N.W.2d 345 (Minn.1990), respondent, a sole practitioner, had a prior private admonition and two prior private warnings. Respondent failed to attend three court appointments, issued an insufficient funds check to opposing counsel for a court awarded fee, and failed to pay two judgments for law related debts.

*Id.* at 345–46. Finding this conduct prejudicial to the administration of justice in violation of Minn.R.Prof.Conduct 8.4(d), the court stated:

> [W]hile anyone may mistakenly write an insufficient funds check, the context here is more serious. Respondent failed to pay the fees within the requisite time period, then issued the bad check. After being notified the check was returned for insufficient funds, he failed to issue a substitute check—although he said he would—until [the opposing counsel] filed an ethics complaint against him.

*Id.* at 347. There, as here, the court "feel[s] this type of misconduct, which involves judgment calls, does not lend itself well to correction by supervised practice." *Id.* at 349.

Based on the referee's findings of professional misconduct, Respondent's extensive history of blatantly disregarding his professional responsibilities, and a conviction that yet another period of probation would be no more successful than the first two, we hold that the appropriate sanction is an indefinite suspension pursuant to Rule 15(a)(2), RLPR, for a minimum of three years.

Because Respondent is a sole practitioner and may require some time to make arrangements for his suspension and to notify clients, Respondent's suspension shall take effect 30 days from the date of this order. *In re Ruffenach,* 486 N.W.2d 387, 391 (Minn. 1992) (citing Recommendation 20 of the Report of the ABA Commission on Evaluation of Disciplinary Enforcement (May 1991)). Respondent shall comply in all respects with Rule 26, RLPR, and Respondent may not petition for reinstatement pursuant to Rule 18, RLPR, until three years after the effective date of this suspension.

Indefinite suspension for a minimum of three years, to take effect 30 days from the date of this order.