In re Petition for DISCIPLINARY AC-
TION AGAINST James T. HANVIK,
an Attorney at Law of the State of
Minnesota.

No. C3–99–815.

Supreme Court of Minnesota.

April 27, 2000.

Edward J. Cleary, Director, Eric T. Cooperstein, Senior Assistant Director, Office of Lawyers Professional Responsibility, St. Paul, for appellant.

Michael J. Hoover, Minneapolis, for respondent.

## OPINION

### PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against respondent James T. Hanvik on May 19, 1999. Hanvik responded on May 25, 1999, admitting most of the allegations in the petition. A hearing was held on August 20, 1999, where Hanvik presented mitigation evidence and evidence as to the few contested factual matters. The referee filed his Findings of Fact, Conclusions of Law and Recommendations for Discipline on September 30, 1999, in which he rejected Hanvik's mitigation claims of psychological disorder, remorse, pro bono work, and volunteer activities, and recommended that Hanvik be indefinitely suspended. We agree and order an indefinite suspension from the practice of law without leave to apply for reinstatement for two years.

James T. Hanvik was admitted to the practice of law in Minnesota on October 17, 1984. He has no prior disciplinary history. In December 1996, the Director of the Office of Lawyers Professional Responsibility (director) received a complaint from Sharon Henke, a client of Hanvik's, charging that he was withholding funds from her. An investigation of the complaint led to an audit of Hanvik's trust account for the period of November 1994 through August 1998. The audit discovered numerous misappropriations from Hanvik's trust account, as well as a general failure to maintain trust account records. The referee's findings of fact about the misconduct, which were not contested by either party, are summarized here.

Hanvik's misconduct primarily arose in three separate legal matters. The first count of misconduct involved Hanvik's actions while handling a legal matter for Sharon Henke from February 1995 to December 1996. Henke retained Hanvik to pursue a dram shop action and to handle the estate of her son, Kevin Conrad, who died on November 25, 1994, in a car accident after leaving a bar. Hanvik's representation violated a number of the Minnesota Rules of Professional Conduct (MRPC). First, Hanvik endorsed Conrad's last paycheck for $887.78 (Conrad paycheck), which was made out to Henke as the personal representative of his estate, without Henke's authorization. Then Hanvik deposited it in his trust account and disbursed the proceeds to himself, thus misappropriating the funds. Then, when Henke repeatedly inquired about the status of the check from March 1995 to November 1996, Hanvik failed to respond to her inquiries.

Hanvik settled the dram shop action, with Henke's authorization, for $8,500 in the fall of 1995. Shortly after negotiating the settlement, but prior to receiving a settlement check, Hanvik disbursed a portion of his share of the settlement to himself, thus misappropriating $2,000 of other clients' funds in his trust account to do so. Upon receiving the check, Hanvik gave Henke $5,000, deducting $264 for filing fees he had never incurred and retaining $328.97 to "take care of any final expenses that might arise."

Hanvik decided to withdraw from his representation of Henke in December 1996, prompted in part by her threats to complain about his mishandling of the Conrad paycheck. In his withdrawal letter, he told Henke that her accusations of "some sort of ethical lapse are entirely unfounded." He falsely stated "[n]otwith-

standing the fact that we had, and have, every right to pay out those funds for services and costs, in reviewing my trust account records, I discovered that I have not expended any funds from the deposit of Kevin's check." Hanvik enclosed a check for $1,216.75 to cover the $887.78 Conrad paycheck and the $328.97 he had retained from the settlement.[1]

Henke filed a complaint with the director's office a few days before receiving Hanvik's letter and check, which prompted an investigation. In response to a request by an investigator, Hanvik produced a ledger purporting to detail the trust account activity for the Henke representation. The ledger did not reflect Hanvik's disbursement of the Conrad paycheck, did not comport with Hanvik's other trust account records, and was not prepared contemporaneously with the documented transactions. Hanvik did not disclose to the investigator that the ledger was not accurate and he did not respond to the investigator's request for additional information about the ledger.

Based on these facts, the referee concluded that Hanvik violated Rules 1.4, 1.15(a), 1.15(b), 1.15(h), 4.1, 8.1(a)(1), and 8.4(c) of the MRPC during his representation of Henke and the subsequent investigation. Specifically, Hanvik misappropriated the Conrad paycheck, made false statements to Henke, failed to respond to Henke's inquiries about the Conrad paycheck, misappropriated trust account funds by distributing $2,000 to himself prior to receipt of the settlement check, falsely billed Henke for filing fees not incurred, and provided an incomplete and inaccurate ledger to the District Ethics Committee investigator. The referee found, however, that "notwithstanding Hanvik's misconduct," ultimately Henke did not suffer any

loss "except for the use of the funds and interest on money she should have received earlier."

The second count of misconduct involved Hanvik's representation of J.B. in a personal injury claim. The claim was settled on November 17, 1994, for $5,000 with J.B.'s consent. Medicare held a subrogation claim of $1,934.46 on the settlement.[2] Knowing this, Hanvik falsely told a Medicare claims agent, Karen Holst, that the case was settled for $3,500, inducing Medicare to reduce its claim to one-third of the purported settlement amount, or $1,166.67. Then, although Hanvik gave J.B. her share of the settlement and wrote a check to himself for his fees, he did not forward the $1,166.67 subrogation amount to Medicare.

Holst wrote Hanvik in August 1995 and again in January 1997 inquiring about the status of the settlement. In response to these inquiries, Hanvik first falsely claimed that the delay was due to his inability to contact J.B. regarding the settlement of the Medicare claim. Then, in April 1997, Hanvik sent Medicare a check for $912.29 rather than the entire $1,166.67 that Medicare believed it was owed, explaining that he had deducted $150 for a knee brace purchased by J.B. in 1993, and $104.38 for one-half of the costs of the lawsuit J.B. had paid to him. Hanvik claimed that J.B. was entitled to that part of Medicare's share, but he did not forward the money to J.B., and never held those funds in his trust account in anticipation of forwarding them to J.B.

At the time Hanvik paid Medicare the $912.29, he did not have sufficient funds in his trust account from J.B.'s settlement to pay the entire subrogation claim. This was due to the fact that he had made additional disbursements totaling $750 to himself out of the account in March 1996

---

1. We are unable to find any information in the record indicating that the $264 improperly retained from the dram shop settlement to cover nonexistent filing fees was ever paid to Henke.

2. The parties and referee identified the subrogation amount as $3,090.80 throughout the proceedings and in their briefs. However, the affidavit of Medicare agent Karen Holst, states that the subrogation amount was $1,934.46.

that he attributed to the J.B. case. Hanvik had issued the checks to himself as "cost reimbursements" and "fees" even though he was not entitled to any additional fees from the case and had been reimbursed for all costs.

On the eve of his disciplinary hearing, Hanvik sent a check for $500 to Medicare, a portion of the money he wrongfully kept by falsely representing the extent of J.B.'s settlement. Hanvik also brought to the hearing a check for $254.38 made out to J.B., claiming that he was unable to locate J.B. to reimburse her for those amounts he deducted from Medicare's claim.[3] The referee concluded that Hanvik violated Rules 1.15(a), 8.4(c), and 8.4(d) of the MRPC for making false statements to Medicare and for misappropriating $750 in March 1996.

The third count of misconduct stems from Hanvik's meeting with T.K. on May 8, 1996, to discuss representing T.K. in a divorce. At the meeting, T.K. gave Hanvik a $500 retainer and told Hanvik not to proceed with an action until further contact. T.K. specifically instructed Hanvik not to contact him because he did not want his wife to know he was considering a divorce.

Hanvik deposited the retainer from T.K. in his trust account, but never heard from T.K. again about the divorce. While there were no withdrawals corresponding to T.K.'s funds during the audit period, the trust account balance fell to $108.23 in April 1998 indicating the retainer had been misappropriated. In an attempt to explain this discrepancy, Hanvik falsely claimed in a letter to the director on July 14, 1998, that he had earned all of T.K.'s retainer. In support of that claim, Hanvik produced a billing statement, dated June 15, 1996, which falsely represented that he had met with T.K. and prepared the necessary documents to initiate divorce proceedings. Although Hanvik may have been entitled to keep some of the retainer and T.K. never asked for the retainer to be returned, on the day of the hearing Hanvik returned the entire $500 to T.K. plus $130 in interest. The referee concluded that Hanvik violated Rules 1.15(a), 8.1(a)(1), and 8.4(c) of the MRPC by preparing a false billing statement and providing it to the director, and failing to hold T.K.'s retainer in his trust account.

Count four of the director's petition for disciplinary action identified various other misappropriations discovered during the investigation of Hanvik's trust account records. First, the trust account should have had a minimum balance of $2,000 through May 1996 corresponding to funds held on behalf of a client, Land Office Realty, Inc. (LORI), that were the subject of a bankruptcy action. However, from November 1994 to May 1996 the trust account held no more than $297.71. In May 1996, after the bankruptcy court determined that LORI was entitled to the money, Hanvik issued a trust account check to LORI for $2,000. In addition, in 1996 Hanvik over-disbursed $75 to himself from one client's fund, causing misappropriation of other client funds. He also received payments totaling $1,025 from a debtor on behalf of another client, T.H., but paid out to T.H. only $950.

Finally, between November 1994 and August 1998, Hanvik failed to maintain trust account records or client ledgers, performed no reconciliations of his trust account with his bank statements, and made additional misappropriations. Thus

---

3. Hanvik states that Medicare has now received one-third of the actual settlement, or $1,666.67 (minus the $254.38 he deducted for J.B.). He claims that it is not uncommon for Medicare to agree to a one-third division in such cases, and therefore suggests that Medicare has been fully compensated. In contrast, Holst stated in her affidavit that Medicare will only reduce its claim when requested in writing under certain circumstances, and that no such request was ever received from Hanvik even when Medicare believed the settlement to be $3,500 and orally agreed to reduce its claim, contingent on receiving a written request. By our calculations, if Medicare's original claim was $1,934.46, and assuming Hanvik's deductions totaling $254.38 are valid, then after the $912.29 and $500 payments, there remains $267.79 unpaid on the claim.

Hanvik's certifications on his 1995, 1996, 1997, and 1998 attorney registration statements that he properly maintained trust account books and records were false. The referee concluded these actions violated Rules 1.15(a)-(b), (g)-(h), and 8.4(c) of the MRPC.

Hanvik's misconduct with respect to the trust account was not limited to his lack of records and related misappropriations. During the audit, Hanvik wrote a letter to the director on April 13, 1998, falsely stating he never deliberately took money from the trust account when it was not actually owing to him, was aware at all relevant times what the balance in the account should be, and that the closing balance was what he expected it to be. On July 14, 1998, Hanvik repeated these false statements, and also falsely stated that he had reviewed the balances of all clients for whom he held funds in his trust account, and falsely described the delay in payment to Medicare. The referee concluded these false statements violated Rules 8.1(a)(1) and 8.4(c) of the MRPC.

Because Hanvik admitted most of the misconduct in the director's petition, his evidence at the hearing primarily went to establishing mitigating factors. Hanvik testified that he was remorseful, and presented evidence of his pro bono work and volunteer activities for the bar and in the community. Hanvik also claimed his depression was a psychological disorder that should be a mitigating factor. In support of this claim, Hanvik testified at the hearing and also submitted the deposition testimony of Dr. Harold Steiger, a licensed psychologist. Hanvik has been seeing Dr. Steiger since June 1998, and is on antidepressant medication. At the deposition, Dr. Steiger testified that when Hanvik came to him, Hanvik was in a major depressive episode and that Hanvik described other major depressive episodes that he had experienced. Dr. Steiger characterized Hanvik's depression as "serious," preferring to use that term rather than the "mild, moderate, or severe" DSM–4 classifications. However, on cross-examination, Dr. Steiger admitted that he would place Hanvik "in the fifties" on a recognized diagnostic scale, indicating a moderate level of depression.

Following the hearing, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law, including recommendations for sanctions, to the referee. The director requested Hanvik be disbarred. Hanvik conceded that his misconduct warranted at least a suspension, but argued that disbarment was too severe a result in light of mitigating factors.

The referee rejected much of Hanvik's mitigation evidence. In his Findings of Fact, Conclusions of Law and Recommendations for Discipline, the referee noted that Hanvik only made restitution to Henke after a number of demands and a complaint to the director; that restitution to T.K. was made the day of the hearing; and that restitution to Medicare was not made until after the disciplinary proceedings were commenced. He found that Hanvik was not remorseful and did no more pro bono or volunteer work "than is generally expected of any attorney." In addition, the referee determined that while Hanvik has a moderate form of depression it does not rise to the level of a severe psychological disorder, and that the depression did not cause Hanvik's misconduct. Finally, the referee found that Hanvik's false statements to an investigator, to the director, and to Medicare while under investigation for the Henke complaint were aggravating factors.

Even so, the referee recommended that Hanvik be suspended indefinitely rather than disbarred. He credited Hanvik for his lack of prior disciplinary history and noted the small amounts of money involved in the misappropriations. He also concluded that ultimately there was no loss to Henke, T.K., or Medicare, and there was only a small loss to J.B.

■ Because neither the director nor Hanvik disputes the referee's findings of facts or conclusions of law that Hanvik's actions constitute professional misconduct, the only issue before this court is the appropriate level of discipline to impose. Although the director asked the referee for disbarment, the director now accepts the referee's recommendation of suspension and only asks this court that the suspension be without leave to apply for reinstatement for three years. The director argues that Hanvik's pattern of misappropriations is a serious concern, and the small sums involved do not lessen the gravity of the misconduct. The director adds that similar misconduct has led to disbarment even when misappropriations totaled less than $5,000, and here Hanvik committed additional misconduct.

Hanvik agrees that he should be suspended, but asks for leave to apply for reinstatement after one year. Hanvik claims that his misconduct did not result in substantial losses to anyone, and he has made restitution "to the best of his ability, sometimes to the extent of depriving himself of compensation to which he is legitimately entitled." He also requests this court to consider his remorse, depression, pro bono work, and volunteer activities as mitigating factors even though the referee rejected this evidence.

■ A referee's findings of fact will not be set aside unless they are clearly erroneous or not supported by the evidence. *See In re LaChapelle*, 491 N.W.2d 17, 20 (Minn.1992). In particular, this court "accords deference to a referee's findings when they are based on conflicting testimony or in part on a respondent's demeanor, credibility, or sincerity." *In re Hartke*, 529 N.W.2d 678, 679–80 (Minn.1995). Upon review of the record before us, we conclude that the referee's findings as to Hanvik's remorse, pro bono work, and volunteer activities, are adequately supported by the record.

■ Likewise, we agree with the referee that Hanvik's depression does not rise to the level of a severe psychological disorder. When a respondent attorney

> raises psychological disability as a mitigating factor, he must prove that he indeed has a severe psychological problem, that the psychological problem was the cause of the misconduct, that he is undergoing treatment and is making progress to recover from the psychological problem which caused or contributed to the misconduct, that the recovery has arrested the misconduct, and that the misconduct is not apt to recur.

*In re Weyhrich*, 339 N.W.2d 274, 279 (Minn.1983). One advancing a claim of psychological disability must show by clear and convincing evidence each of these five requirements. *See In re Pyles*, 421 N.W.2d 321, 324–25 (Minn.1988). Hanvik's evidence of his depression consisted of his own testimony and that of Dr. Steiger, who preferred to characterize Hanvik's depression as serious. We have previously rejected the argument that a serious disorder is equivalent to a severe disorder. *See In re Shoemaker*, 518 N.W.2d 552, 554 (Minn.1994). In addition, Dr. Steiger admitted on cross-examination that Hanvik's depression was at a moderate level on a recognized diagnostic scale, and that his own characterization of a severely depressed person did not describe Hanvik. Thus, we agree with the referee that Hanvik's depression is not a mitigating factor.

■ Having so concluded, we now turn to a determination of the appropriate discipline to be imposed. The purpose of attorney discipline is not to punish the attorney. *See In re Madsen*, 426 N.W.2d 434, 435 (Minn.1988). In determining the appropriate sanction, this court weighs "the nature of the misconduct, the cumulative weight of the disciplinary rule violations, and the potential harm to the public, to the legal profession, and to the administration of justice." *Pyles*, 421 N.W.2d at 325. We may look to cases involving similar misconduct as guides to reaching a

conclusion. *See In re Margolis,* 570 N.W.2d 688, 691 (Minn.1997). However, while this court strives for consistency in disciplinary matters, "each case is unique and must be examined on its own facts." *In re Dvorak,* 554 N.W.2d 399, 403 (Minn. 1996).

Hanvik failed to maintain trust account records, misappropriated client funds, and made false statements to clients, the director, and a Medicare representative. Depending on the facts of a particular case, this court has used a variety of disciplinary sanctions for such misconduct. *See, e.g., In re Szymialis,* 557 N.W.2d 554, 555–56 (Minn.1997) (indefinite suspension without leave to apply for reinstatement for two years); *LaChapelle,* 491 N.W.2d at 21 (disbarment); *Pyles,* 421 N.W.2d at 327 (indefinite suspension without leave to apply for reinstatement for two years); *In re Heffernan,* 351 N.W.2d 13, 15 (Minn.1984) (three-month suspension and three-year probation).

Several cases are particularly instructive to us in determining the appropriate sanction in light of the facts here. In *Pyles,* an attorney misappropriated approximately $60,000 of client funds deposited in his trust account to repay other clients whose trust funds had been misused and for his own personal and family use. *See Pyles,* 421 N.W.2d at 323. Pyles also made false statements to a client, failed to maintain trust account records, handled a matter where he had a conflict of interest, and failed to file income tax returns. *See id.* at 323–24. Pyles' serious misconduct raised the specter of disbarment, but it was mitigated by his exemplary life outside the profession. *See id.* at 326. The court also determined that Pyles' full restitution of the funds, his extensive work for his church, and his significant pro bono work, which had a detrimental effect on his personal finances and thus led him to misappropriate client funds, were special circumstances warranting consideration. *See id.* at 323, 326. Pyles' depression was rejected as a mitigating factor because it was not a severe psychological disability, was not a cause of the misappropriations, and he had not shown sufficient recovery to arrest the conduct. *See id.* at 325. The court concluded that Pyles should be indefinitely suspended without leave to apply for reinstatement for two years. *See id.* at 327.

In contrast to Pyles, Hanvik misappropriated less than $5,000, an amount that compares more closely to that in *Heffernan,* where an attorney misappropriated between $7,000 and $9,000 from an estate, failed to keep "even rudimentary" trust accounts and records, and commingled personal and client funds. *See Heffernan,* 351 N.W.2d at 14. This court noted that Heffernan "devoted substantial time to pro bono work," made restitution to his clients, and Heffernan's personal and professional life were in turmoil at the time of the misappropriation, which was an isolated occurrence. *See id.* at 14–15. Heffernan was suspended for only three months and placed on supervised probation for three years. *See id.* at 14.

Clearly Hanvik's misconduct, involving not only misappropriations but also misrepresentations to the director, clients, and Medicare, requires a greater sanction than that imposed in *Heffernan.* In addition, Hanvik's only mitigating factors are that he has no prior disciplinary history and has made restitution in nearly all of the cases.

We conclude that the sanction imposed in *Pyles* is also appropriate here – an indefinite suspension without leave to apply for reinstatement for two years. While Hanvik does not have the mitigating circumstances described in *Pyles,* Hanvik's misconduct is not as egregious as that in *Pyles,* which involved substantially greater sums of money, a conflict of interest, and a failure to pay taxes. *See Pyles,* 421 N.W.2d at 323–24. In other words, while Hanvik has fewer mitigating factors than noted in *Pyles,* when this is coupled with Hanvik's lesser misconduct we arrive at the same sanction imposed in *Pyles.*

Other cases also support this sanction. *See Szymialis,* 557 N.W.2d at 555–56 (imposing indefinite suspension for at least two years for misconduct including violations of fees rules, failure to maintain account records, misrepresentations to a client, misuse of the legal process, failure to communicate with clients, and failure to cooperate with the director's investigation); *In re Kinnunen,* 502 N.W.2d 773, 773–75 (Minn.1993) (imposing indefinite suspension without leave to apply for reinstatement for 18 months for neglect of legal matters, allowing trust account balance to fall below zero, and failing to cooperate with the disciplinary process); *In re Stockman,* 502 N.W.2d 209, 212 (Minn. 1993) (holding that respondent's conduct in committing numerous trust account violations, making false representations, neglecting client files, practicing law while suspended, and failing to cooperate with the director required an indefinite suspension for at least two years).

As in the cases cited above, Hanvik has engaged in a pattern of misconduct involving misappropriations, misrepresentations, and trust account record keeping violations. For these reasons, we order that James T. Hanvik:

1. Be indefinitely suspended from the practice of law pursuant to Rule 15(a)(2), Rules on Lawyers Professional Responsibility (RLPR), with no right to apply for reinstatement for a period of two years;

2. Contact Medicare regarding the J.B. settlement and fully satisfy any remaining claims by Medicare;

3. Comply fully with the requirements of Rule 18, RLPR, should he apply for reinstatement; and

4. Pay to the Director a sum of $900 for costs and disbursements pursuant to Rule 24, RLPR.

Indefinite suspension ordered.