In re Petition for DISCIPLINARY AC-
TION AGAINST Chester C. GRA-
HAM, an Attorney at Law of the State
of Minnesota.

No. C4–86–1715.

Supreme Court of Minnesota.

May 11, 2000.

Edward J. Cleary, Director, and Betty M. Shaw, Senior Assistant Director, Office of Lawyers Professional Responsibility, St. Paul, for petitioner.

David Gronbeck, Minneapolis, for respondent.

## OPINION

PER CURIAM.

Respondent, Chester C. Graham, has been licensed to practice law in Minnesota since October 1983. Since that time, he has had an extensive disciplinary history. In February 1985, Graham was admonished for incompetence, neglect, and misrepresentation; in October, 1986, he was publicly reprimanded and given two years supervised probation for neglect, failure to communicate with a client, false statements, and failure to cooperate with the disciplinary investigation; in March 1987, while still on probation, Graham received an admonition for failure to cooperate with a disciplinary investigation; and in March 1989, Graham was indefinitely suspended with no right to reinstatement for a minimum of 18 months for neglect, ignoring court orders, retaining unauthorized fees, and failure to cooperate with the disciplinary investigation. In October 1993, Graham was reinstated to the practice of law and placed on indefinite supervised probation. In December 1997, while still on probation from his 1993 reinstatement, Graham received an admonition for improper notarization of a client's verification of an amended answer. Graham was on CLE restricted status from February 5, 1998 until March 27, 1998, and in August 1999, Graham was admonished for improper fee sharing.

On July 27, 1999, the Director of the Office of Lawyers Professional Responsibility filed a Petition for Revocation of Probation and for Further Disciplinary Action against Graham. The petition was based on the Director's allegations that Graham misappropriated client funds in the amount of approximately $9,000 from his trust account and an account he opened as Roger Kielmeyer's agent, charged an unreasonable fee of $9,000 for doing virtually no work, neglected client matters, failed to obey court orders, violated probation by failing to cooperate with his supervising attorneys, failed to cooperate with the disciplinary investigation, failed to maintain adequate trust account books and records, made false certifications with respect to his trust account books and records, and practiced law while on CLE restricted status.

A disciplinary hearing was held before a referee appointed by this court, on October 27, 1999, at which Graham was personally present, participated, and was represented by counsel. In his Findings of Fact, Conclusions of Law and Recommendation for Discipline dated November 22, 1999, the referee agreed with the Director's allegations and found that Graham's actions violated Rules 1.15(a) and (c), 1.3, 1.5(a), 3.2, 3.4(c), 5.5, 8.1(a)(3) and 8.4(c) and (d) of the Minnesota Rules of Professional Conduct; Lawyers Professional Responsibility Board Opinion No. 9; Rule 25 of the Rules on Lawyers Professional Responsibility (RLPR); and the October 26, 1993 reinstatement order placing him on indefinite supervised probation. The referee recommended that Graham be disbarred. On December 1, 1999, Graham was temporarily suspended, in accordance with Rule 16(e), RLPR, pending the final outcome of

this disciplinary proceeding. By letter dated December 2, 1999, the Director informed Graham of his duty to notify his clients of his suspension pursuant to Rule 26, RLPR. On December 28, 1999, the Director submitted an affidavit of noncompliance, informing the court that Graham has not filed the required affidavits demonstrating Rule 26 compliance.

Pursuant to Rule 14, RLPR, Graham filed a certificate as to transcripts, thereby preserving his right to challenge the referee's factual findings. *See generally In re Harp,* 560 N.W.2d 696, 700 (Minn. 1997). The court reporter delivered the transcripts on December 21, 1999; but to date, Graham has not filed a brief in this matter nor has he taken any other action to challenge the referee's findings or conclusions. Furthermore, Graham did not appear at the April 10, 2000, oral argument in this court. We will uphold a referee's findings and conclusions in attorney disciplinary proceedings unless clearly erroneous. *See In re Jontz,* 590 N.W.2d 777, 779 (Minn.1999). Because Graham has not presented any argument with respect to the referee's findings of fact or conclusions of law and because there is nothing else before us suggesting that they are clearly erroneous, we conclude that the referee's findings and conclusions must be upheld.

As a result, the only issue left for resolution is the appropriate discipline to be imposed. The purpose of attorney discipline is not to punish, but to "guard the administration of justice and to protect the courts, the legal profession and the public." *In re Dovolis,* 572 N.W.2d 734, 736 (Minn.1998) (quoting *In re Serstock,* 316 N.W.2d 559, 561 (Minn.1982)). A referee's disciplinary recommendation is entitled to great weight, although it is ultimately this court's responsibility to determine the appropriate discipline. *See In re Randall,* 562 N.W.2d 679, 683 (Minn.1997). When

determining the appropriate discipline for attorney misconduct, we consider the nature of the misconduct, the cumulative weight of the rule violations, the harm to the public, and the harm to the legal profession. *See In re Harp,* 560 N.W.2d at 700. We also consider any aggravating or mitigating circumstances. *See id.* Although we examine each case's factual situation independently, other disciplinary cases provide guidance as to the appropriate discipline for specific misconduct. *See In re Randall,* 562 N.W.2d at 683. In addition, the attorney's disciplinary history is relevant. *See In re Hartke,* 529 N.W.2d 678, 683 (Minn.1995). We have said that we " 'expect[ ] a renewed commitment to comprehensive ethical and professional behavior' after a disciplinary proceeding, and '[w]here leniency has been shown once, we are reluctant to do so again.' " *In re Haugen,* 543 N.W.2d 372, 375 (Minn.1996) (quoting *In re Isaacs,* 451 N.W.2d 209, 212 (Minn.1990)).

"Disbarment is the usual discipline for attorney misappropriation of client funds except in instances when the attorney presents clear and convincing evidence of substantial mitigating circumstances which show that the attorney did not intentionally convert the funds." *In re Randall,* 562 N.W.2d at 683 (quoting *In re LaChapelle,* 491 N.W.2d 17, 21 (Minn. 1992)). Disbarment is also an appropriate sanction for repeated serious misconduct. *See In re Weems,* 540 N.W.2d 305, 309 (Minn.1995) (disbarring attorney for violating terms of probation, misappropriation of client funds, noncooperation, and exhibiting a pattern of neglect, noncommunication, and failure to return client files and unearned retainers); *see also In re Goldstein,* 581 N.W.2d 36, 36 (Minn.1998) (disbarring attorney for misappropriation of client funds, client neglect, failure to pursue or properly handle client matters, unauthorized practice of law, and noncooperation).

In this case, the record establishes that Graham has engaged in repeated serious misconduct, including the misappropriation of client funds. The referee concluded that Graham's extensive disciplinary history for similar misconduct was a significant aggravating factor; we agree. The fact that the current misconduct occurred while Graham was on probation is also a significant aggravating factor. The referee did not identify any mitigating circumstances and none have been brought to our attention. Based on his current misconduct, it is clear that after Graham's reinstatement to the practice of law in 1993, he did not have a "renewed commitment to comprehensive ethical and professional behavior." Therefore, we conclude that disbarment is the only appropriate discipline.

Respondent, Chester C. Graham, is ordered disbarred.

## APPENDIX

The referee's findings of fact, absent references to the record, and conclusions of law in this case are as follows:

*Misappropriation and Unreasonable Fee*

3. Roger Kielmeyer was convicted of criminal vehicular homicide and sentenced to prison due to a February 1994 alcohol-related motor vehicle accident resulting in the death of a child (Evenson). Roger Kielmeyer is respondent's cousin.

4. The survivors of the minor child brought a wrongful death action against Roger Kielmeyer, his wife, Marylou Kielmeyer, and others. The Kielmeyers' liability carrier retained Gerald M. Linnihan to represent them in the civil matter. Stephen Torvik represented the plaintiffs.

5. On April 4, 1996, Linnihan's office wrote to Marylou Kielmeyer informing her that the court had set June 17, 1996, as the trial date in the wrongful death matter.

6. On April 8, 1996, respondent wrote to Roger Kielmeyer at the Minnesota Correctional Facility (MCF) at Faribault stating he had interviewed Marylou regarding a possible Chapter 7 bankruptcy petition to protect as many assets as possible in case the wrongful death judgment exceeded their insurance liability limits. Respondent enclosed a retainer agreement for the Kielmeyers' signature which was reviewed and rejected.

7. Neither respondent nor the Kielmeyers had spoken with Linnihan about the status of the case or about the possibility of a verdict or settlement in excess of the policy limits.

8. On April 14, 1996, respondent met with Marylou Kielmeyer and obtained her signature on a revised retainer agreement providing for a $9,000 non-refundable fee. Marylou also signed over to respondent her interest in 750 shares of Otter Tail Power Company common stock (Otter Tail stock).

9. On April 15, 1996, respondent visited Roger Kielmeyer at the MCF and obtained Kielmeyer's signature on the revised retainer agreement. Kielmeyer paid the fee by signing over to respondent the Otter Tail stock certificate previously obtained from Marylou.

10. The Kielmeyers retained respondent for representation in the Evenson wrongful death matter, a Chapter 7 bankruptcy petition for Marylou Kielmeyer and pre-bankruptcy and asset protection for Roger and Marylou Kielmeyer.

11. On April 15, 1996, respondent traveled from Faribault, Minnesota to Minneapolis, Minnesota where he cashed in 750 shares of Otter Tail stock with U.S. Clearing Corp.

12. On the evening of April 15, 1996, Marylou Kielmeyer committed suicide.

13. On April 19, 1996, U.S. Clearing Corp. issued a check payable to respondent in the amount of $28,119.49 which respondent personally picked up and deposited the funds into his trust account.

14. On April 22, 1996, respondent withdrew his $9,000 fee from his trust account via a money order withdrawal.

15. On or about April 24, 1996, the Evensons informed Torvik that they did not want to pursue a judgment in excess of the Kielmeyers' liability limits.

16. On April 24, 1996, respondent disbursed $4,674 of the Kielmeyers' funds via a money order withdrawal to pay for Marylou Kielmeyer's funeral expenses.

17. On April 24, 1996, respondent wrote to Roger Kielmeyer stating, "I am handling these financial things for you without charging a fee because you are my cousin. The Marylou thing is another matter as my name is on legal papers as attorney. Also, if a bankruptcy is necessary I will need to charge you the regular rate."

18. Shortly after April 25, 1996, Linnihan told respondent by telephone that the matter had been settled for the insurance policy limits.

19. Respondent took no action on behalf of the Kielmeyers in the wrongful death action other than writing to Linnihan on April 25, 1996, advising him that the Kielmeyers had retained him for representation in the civil matter to the extent the Kielmeyers' liability exceeded their policy limits.

20. Respondent did not at any time speak with Stephen Torvik. Respondent's only communication with Torvik was to mail Torvik a carbon copy of his April 24, 1996, letter to Linnihan.

21. Respondent did not draft, serve or file an answer on behalf of the Kielmeyers and did not respond to, or conduct any, discovery on behalf of the Kielmeyers.

22. Respondent had no prior experience with personal injury or wrongful death cases, including defense of a liability action for damages in excess of the policy limits. He determined the amount of retainer from discussions he had with Lynn Castner, an attorney whom respondent felt had experience on the issue.

23. Respondent's first and largest nonrefundable retainer was the $9,000 Kielmeyer retainer. Since his reinstatement in October 1993, respondent's next largest retainer was about $1,000.

24. Respondent did not file a bankruptcy petition for the Kielmeyers. Respondent did not even open an office file for them.

25. While respondent did discuss with the Kielmeyers the availability of personal bankruptcy to address a possible judgment in excess of their policy limits in the wrongful death matter, respondent performed no services for the Kielmeyers pursuant to their retainer agreement because such an option became unavailable upon the death of Marylou Kielmeyer on the same day the retainer was executed.

26. Respondent did no asset planning on behalf of Roger Kielmeyer. Respondent did not know the extent of Roger Kielmeyer's assets beyond a belief that Kielmeyer had non-exempt assets consisting of a second automobile and $20,000 to $30,000 in non-exempt stock. Respondent did not have any specific discussion with Roger Kielmeyer concerning Kielmeyer's assets. Respondent did not know the value of Kielmeyer's Edward Jones account.

27. On May 14, 1996, respondent wrote to Roger Kielmeyer requesting, among other things, his signature on an agency

agreement. Roger signed the agency agreement on May 15, 1996.

28. Respondent continued to act as Roger Kielmeyer's attorney in handling Roger's financial affairs. Respondent's assertion that he was not acting as Roger Kielmeyer's attorney when performing as Kielmeyer's agent is contradicted by respondent's letters of April 18, 1996, stating respondent represented Roger Kielmeyer and signed by respondent as Attorney at Law, by the fact that respondent signed in as Kielmeyer's attorney when visiting Kielmeyer at the MCF and respondent mailed correspondence regarding the agency relationship to Kielmeyer at the MCF as "legal mail."

29. On May 9, 1996, respondent made an unauthorized withdrawal from Roger Kielmeyer's funds in his trust account by a $150 check payable to himself. Respondent indicated on the Roger Kielmeyer trust account client subsidiary ledger that the withdrawal was for attorney fees.

30. Respondent did not inform Kielmeyer of the May 9, 1996, withdrawal and could not identify what legal services he was being paid for or otherwise account for this withdrawal.

31. On May 14, 1996, respondent withdrew from his trust account $1,157.11 of Kielmeyer funds by a check payable to himself. On the Kielmeyer subsidiary ledger, respondent indicated the check was payable to Sherburne–Wright County for real estate taxes.

32. On May 14, 1996, respondent deposited to his business account the $1,157.11 withdrawn from his trust account. Respondent did not on any subsequent date disburse equivalent funds from his business account to or on behalf of Roger Kielmeyer.

33. Kielmeyer's 1996 Wright County real estate taxes were paid by Kielmeyer's mortgage company, First Nationwide Mortgage.

34. Respondent made such withdrawal without Kielmeyer's permission or consent and did not inform Kielmeyer of the May 14, 1996, withdrawal. Respondent could not account for, or explain, this disbursement.

35. Respondent misappropriated $1,307.11 from trust account funds belonging to Roger Kielmeyer during May 1996.

36. On May 17, 1996, respondent deposited Kielmeyer's remaining funds ($12,458.28) from his trust account into National City Bank account no. 4811771, entitled Chester C. Graham Agent for Roger F. Kielmeyer (agency account). On June 4, 1996, respondent deposited $1,343.41 from Kielmeyer's Edward Jones account into the agency account. On June 11, 1996, respondent deposited an additional $7 received from the Internal Revenue Service.

37. On June 5, 1996, respondent wrote to Kielmeyer's mortgage company, First Nationwide Mortgage, signing the letter as an Attorney at Law, enclosing a copy of the agency agreement and asking them to change the address on the loan to respondent's address.

38. On June 5, 1996, respondent disbursed from the agency account check no. 103 in the amount of $472.32 payable to First Nationwide Mortgage. Respondent made similar disbursements from the agency account to First Nationwide Mortgage on June 24, 1996, July 5, 1996, July 12, 1996, July 29, 1996, August 8, 1996, August 11, 1996, and September 9, 1996, for a total of $3,500.24.

39. Between June 14, 1996, and August 15, 1996, respondent misappropriated $7,700 from Roger Kielmeyer by issuing ten checks from the agency account payable to himself as follows:

| Withdrawal Date | Agency Check No. | Payee | Amount |
|---|---|---|---|
| 6/14/96 | 105 | Chester Graham | $ 100 |
| 7/12/96 | 109 | Chester Graham | 500 |
| 7/26/96 | 112 | Chester Graham | 500 |
| 7/29/96 | 114 | Chester Graham | 1,000 |
| 7/31/96 | 115 | Chester Graham | 1,000 |
| 8/2/96 | 116 | Chester Graham | 500 |
| 8/6/96 | 117 | Chester Graham | 1,000 |
| 8/9/96 | 111 | Chester Graham | 100 |
| 8/13/96 | 121 | Chester Graham | 2,000 |
| 8/15/96 | 123 | Chester Graham | 1,000 |
| | | **TOTAL:** | **$7,700** |

40. After withdrawing the above items from the agency account, respondent deposited Kielmeyer's money into his business account no. 1105337 at National City Bank, Minneapolis, entitled Chester C. Graham, attorney at law. The deposits to respondent's business account are as follows:

| Deposit Date | Agency Check No. | Payee | Amount |
|---|---|---|---|
| 7/12/96 | 109 | Chester Graham | $ 500 |
| 7/26/96 | 112 | Chester Graham | 500 |
| 7/29/96 | 114 | Chester Graham | 1,000 |
| 7/31/96 | 115 | Chester Graham | 1,000 |
| 8/2/96 | 116 | Chester Graham | 500 |
| 8/6/96 | 117 | Chester Graham | 1,000 |
| 8/13/96 | 121 | Chester Graham | 2,000 |
| 8/15/96 | 123 | Chester Graham | 1,000 |
| | | **TOTAL:** | **$7,500** |

41. Respondent did not have Kielmeyer's authorization or authority to withdraw, borrow or use Kielmeyer's money in the agency account for his own benefit. Respondent did not inform Roger Kielmeyer that he was withdrawing funds from the agency account for his own purposes. Roger Kielmeyer never ratified or agreed that respondent could borrow or use Kielmeyer's money.

42. As a result of respondent's misappropriations, there were insufficient funds to cover check no. 119 disbursed August 19, 1996, payable to First Nationwide Mortgage for $451.26. The check was returned by the bank for non-sufficient funds (NSF). On August 20, 1996, the National City Bank charged the agency account $21 as a service charge on the NSF check.

43. On August 21, 1996, respondent reimbursed the agency account $600 to restore the account to an end of the month balance of $8.47. On September 9, 1996, respondent reimbursed the agency account $250 to cover a $250 disbursal to First Nationwide Mortgage. On October 16, 1996, respondent reimbursed the agency account $500 in order to cover a $500 disbursal to Roger Kielmeyer dated October 10, 1996, and deposited by Kielmeyer on October 21, 1996.

44. By November 30, 1996, the agency account had a $1.38 negative balance. Respondent paid the $1.38 and closed the account on December 3, 1996.

45. The closed agency account remained short $6,371 ($7,700 in misappropriation, plus $21 NSF check charge, less $1,350 reimbursement) until Kielmeyer demanded an accounting. On or about May 7, 1997, Kielmeyer revoked what he thought was respondent's power of attorney and respondent reimbursed Kielmeyer by depositing $7,800 in Kielmeyer's Edward Jones investment account.

46. On May 9, 1997, Kielmeyer's new attorney, Brian Huling, sent respondent a letter formally discharging him, requesting an accounting and return of all Kielmeyer's funds. When respondent did not reply, Huling wrote to respondent again on June 2, 1997. On June 4, 1997, respondent provided a sketchy accounting but no supporting documentation.

47. On June 19, 1997, Huling wrote respondent asserting that the $9,000 fee paid by the Kielmeyers in 1996 was unreasonable and asking respondent to justify the fee. Respondent did not respond, nor did he provide documentation to support his June 4 accounting.

48. On August 14, 1997, Huling brought a civil suit against respondent on behalf of Roger Kielmeyer to obtain a full accounting.

49. Respondent failed to respond to discovery requests relating to the accounting. On December 17, 1997, the district court issued an order compelling respondent to comply completely with discovery requests and awarding Kielmeyer $480 in attorney fees.

50. Respondent retained counsel who responded to discovery and respondent paid the court-ordered $480 to Kielmeyer's counsel.

51. Respondent and Kielmeyer settled the civil suit and judgment was entered on Kielmeyer's behalf for approximately $16,000. Despite having sold part of a farm respondent inherited valued at approximately $350,000, respondent did not voluntarily pay the Kielmeyer judgment. As of October 27, 1999, Kielmeyer, through Huling, continues to garnish monthly contract for deed payments owed to respondent in order to recover the funds owed to Kielmeyer.

### Neglect and Failure to Obey Court Orders

52. Patrice M. Lachecki, personal representative for the estate of Delores Kathryn Lachecki, retained respondent to probate the estate on June 9, 1994.

53. On May 18, 1995, Houston County District Court wrote to respondent stating that the inventory and appraisement for the Lachecki estate were overdue. Respondent did not respond. The court wrote again on July 18, 1995.

54. On August 22, 1995, respondent forwarded to Patrice Lachecki two copies of the inventory for her review and signature.

55. On August 28, 1995, respondent filed the Lachecki estate inventory.

56. On January 18, 1996, respondent submitted to Patrice Lachecki his statement of services for $1,875.

57. On July 1, 1996, Houston County District Court wrote to respondent inquiring about the status of the Lachecki estate and when respondent anticipated filing the necessary documents to close the estate. Respondent replied on July 16, 1996, stating the estate was due to close and he would submit the necessary documents to close it within a month. Respondent did not do so.

58. On September 9, 1996, the court wrote to respondent inquiring if there was a problem delaying closure. Respondent did not reply.

59. On November 27, 1996, the court wrote to respondent asking him to file the necessary closing documents within three weeks or an order to show cause would be issued.

60. On December 23, 1996, respondent wrote to the court stating the only thing remaining to be done was to file a final accounting for which he needed information from the personal representative. Between December 22, 1996, and March 16, 1997, respondent wrote four letters to Patrice Lachecki requesting the closing statement for the sale of the homestead.

61. On March 14, 1997, the court wrote to respondent asking him to file the necessary documents to close the estate and informing him that if these documents were not received by April 15, 1997, the court would issue an order to show cause.

62. On May 4, 1997, respondent wrote to the court that he had the information and would file the final account after May 16 when he returned from vacation.

63. When respondent had not filed the final account by June 20, 1997, the Houston County District Court issued an order to show cause why respondent should be not be adjudged in contempt of court for failure to provide the documentation to

close the Lachecki estate and ordering him to appear personally before the court on July 17, 1997. The hearing was later reset to October 9, 1997. Respondent did not appear.

64. On October 10, 1997, the court issued an order finding respondent in contempt of court for his failure to complete the information required by the court. The order sentenced respondent to 90 days in the Houston County jail, payment of a $5,000 fine, and set another order to show cause hearing concerning why respondent should not be required to immediately serve that jail time or pay the fine as indicated.

65. On October 13, 1997, the court issued another order to show cause requiring respondent's appearance on November 20, 1997.

66. On November 16, 1997, respondent submitted to the court his proposed final account for the Lachecki estate.

67. Respondent appeared for the November 20, 1997, order to show cause hearing. By order dated November 26, 1997, the court ordered respondent to complete the estate by January 1, 1998.

68. During December 1997 respondent contacted Donald H. Lamm, Esq. who prepared the final accounting and the appropriate consents of the heirs. Respondent failed to mail the consents to the heirs for their signatures and did not file the final account.

69. Respondent did not inform Lamm about the November 20, 1997, order to show cause hearing.

70. On January 23, 1998, respondent learned that a warrant for his arrest had been issued to Hennepin County by Houston County District Court. Respondent retained Donald Lamm to represent him regarding the warrant and asked Lamm to assume representation of the personal representative of the Lachecki estate.

71. Donald Lamm signed a substitution of attorney. The court then issued an order to quash the January 7, 1998, warrant.

72. On February 2, 1998, the court issued an order requiring respondent to report his conduct to the Director. Respondent did not self-report until March 27, 1998.

*Probation Violations*

73. The October 26, 1993, reinstatement order placed respondent on indefinite supervised probation subject to the following conditions:

a. Respondent shall not engage in the solo practice of law until such time as a system for supervising his practice has been established and has been approved by the Director's Office. Respondent shall be supervised by one or more attorneys experienced in the areas in which respondent proposes to practice. Each supervising attorney shall report to the Director at least monthly during the first two years of respondent's probation. After two years, the Director shall evaluate the system for supervising respondent's practice and shall modify the system, as appropriate.

b. Respondent shall abstain from alcohol and mood-altering chemicals and shall continue to attend weekly meetings of Alcoholics Anonymous and Lawyers Concerned for Lawyers. Any instance of lack of abstinence shall constitute sufficient basis for the immediate revocation of respondent's probation and his suspension from the practice of law.

c. Respondent shall timely file his federal and state tax returns.

d. Respondent shall comply with the terms of his agreement with the Director to repay the costs and disbursements pre-

viously ordered by this Court pursuant to Rule 24, RLPR. Respondent shall not be discharged from probation prior to his full payment of these costs.

e. Respondent shall cooperate with the supervising attorneys and with the Director's Office in the investigation of any complaints of misconduct made against him. In addition, respondent shall provide any authorizations which are needed to verify his compliance with the conditions of this probation.

74. During October 1993, Lynn Castner, Vance Bushay, John Holahan, Donald Lamm, and Charles R. Lloyd consented to supervise respondent in various areas of practice. Tim Grathwol served as respondent's overall supervisor. During October 1994, Grathwol resigned as respondent's overall supervisor and Lloyd became respondent's overall supervisor.

75. During October 1995, Lynn Castner hired respondent as an associate. Respondent's probation appeared to be proceeding successfully through December 1996. At the recommendation of respondent's supervisors, respondent's supervision was decreased and Castner became respondent's sole supervisor.

76. Respondent did not advise Castner of the letters he had received from the court or the delays he was experiencing in completing work on the Lachecki estate. Castner first learned about problems in the Lachecki estate when sheriff's deputies appeared in his office in January 1998 with a warrant for respondent's arrest. Respondent did not tell Castner that he had been placed on restricted status by court order for failing to comply with CLE requirements.

77. On April 27, 1998, John M. Koneck signed a consent to supervise respondent's probation.

78. Respondent did not regularly and timely provide case inventories to Koneck.

When Respondent did provide case inventories, it was only after reminder letters and phone calls from Koneck.

79. In his July 13, 1998, supervisor's report, Koneck identified potential problems with respondent's representation of the Foss and Swanson estates. Respondent's work on the Foss and Swanson estate matters had been intermittent at best. Respondent told Koneck that he undertook activity on these files because of client complaints about delays and Koneck's request for updated file summaries. In September 1998, Koneck recommended that respondent take no new probate matters.

80. Despite persistent encouragement by his supervisor, respondent had not completed work on the Foss or Swanson estates by April 1999 and had not provided case summaries for January or March 1999.

81. On April 5, 1999, Koneck wrote to respondent requesting the overdue case summaries. Koneck requested the summaries by the end of the week. Respondent forwarded incomplete and sloppily prepared case summaries to Koneck on or about April 9, 1999. The case summaries did not include the Foss and Swanson probate matters.

82. Respondent has continued to neglect the Foss and Swanson probate matters. As of October 27, 1999, respondent had not completed work on either matter.

83. In his May 5, 1999, supervisor report Koneck noted numerous practice problems including: (1) respondent was using a cordless analog telephone for client communication in violation of Lawyers Professional Responsibility Board (LPRB) Opinion No. 19; (2) respondent was representing clients in contingent fee matters without written fee agreements in violation of Rule 1.5, MPRC; (3) respondent held approximately $18,000 in his trust account,

without discussing the use of a separate interest bearing account with his client and without a written agreement in violation of Rule 1.15, MPRC; and (4) that respondent did not provide case summaries regarding the Foss and Swanson estate matters because respondent had not done any work on those files since their last meeting and did not want to report this to Koneck.

84. On August 18, 1998, the Director requested respondent provide, among other things, his complete trust account records for the period of January 1996 through December 1997 in connection with the investigation of the Kielmeyer matter.

85. Respondent did not provide these trust account records or other requested documents until April 8, 1999, despite the urging of his supervisor and numerous letters and phone calls to respondent's counsel repeating the request for information.

86. One of the conditions of probation was that respondent abstain from the use of alcohol or other mood altering substances. The testimony of respondent and of the supervisors, Castner and Koneck, was unanimously unequivocal that this condition of probation has been continuously met.

### Inadequate Trust Account Books and Records and False Certification

87. The Director's Office reviewed respondent's books and records for the period January 1996 through December 1997. During that period respondent did not maintain subsidiary ledgers, did not perform and maintain evidence of monthly reconciliations of his trust account, checkbook balance, subsidiary ledger trial balance and adjusted bank statements. Respondent did not use numbered trust account checks or fully annotate his trust account check register with client name, payee and purpose of all transactions.

88. During 1996 and 1997 respondent did not maintain his trust account check register and subsidiary ledgers contemporaneously with the occurrence of trust account transactions. The trust account records respondent produced for the Director on April 8, 1999, were, at least in part, prepared after the Director requested those records on August 18, 1998.

89. For the period from at least August 12, 1997, through December 1997, respondent commingled personal and client funds in the trust account.

90. In 1997 and 1998 respondent falsely certified on his attorney registration cards that he maintained the appropriate trust account books and records.

### Unauthorized Practice

91. By order dated February 5, 1998, the Minnesota Supreme Court placed respondent on CLE restricted status for failure to provide proof of attendance at 45 hours of approved continuing legal education prior to June 30, 1997.

92. While on CLE restricted status respondent represented clients and/or provided legal services on February 5, 6, 10, 12, 13, 16, 23, 24, 26 and 27, 1998, and March 2, 3, 6, 18, 20, 23, 24, and 26, 1998.

93. Respondent did not inform Joseph Kaminsky regarding his unauthorized practice of law between February 5, 1998, through March 27, 1998.

94. By order dated March 27, 1998, the Court restored respondent's license to unrestricted status.

### CONCLUSIONS OF LAW

1. Respondent's conduct in the Kielmeyer matter violated this Court's October 26, 1993, probation order, Rules 1.5(a), 1.15(a) and (c), 3.4(c), and 8.4(c) and (d), MPRC, and LPRB Opinion 9.

2. Respondent's conduct in failing to diligently pursue the Lachecki estate and failing to promptly obey the court's orders violated this Court's October 26, 1993, probation order and Rules 1.3, 3.2, 3.4(c), and 8.4(d), MPRC.

3. Respondent's conduct in (1) failing to be candid with his supervisor about the status of his cases or to cooperate with his supervisor by regularly and timely providing case summaries; (2) failing to comply with the Rules of Professional Conduct in the operation of his practice; and (3) failing to cooperate with the Director's investigation of a complaint by timely providing requested trust account books and records violated this Court's October 26, 1993, order, and Rules 3.4(c), 8.1(a)(3), 8.4(c) and (d), MRPC, and Rule 25, Rules on Lawyers Professional Responsibility.

4. Respondent's conduct in failing to maintain appropriate books and records and in falsely certifying to this Court that he maintained such records violated this Court's October 26, 1993, order, Rules 1.15 and 8.4(c), MRPC, and LPRB Opinion 9.

5. Respondent's unauthorized practice between February 5, 1998, and March 27, 1998, violated Rule 5.5, MRPC, and this Court's October 26, 1993, probation order.

6. Respondent's extensive disciplinary history, including prior discipline for repeated neglect of client matters, ignoring court orders, retaining unauthorized client fees, unauthorized practice of law, misrepresentations and failing to cooperate with the Director's Office, constitutes a significant aggravating factor.