In re Petition for DISCIPLINARY AC-
TION AGAINST Garrett T. GEIGER,
an Attorney at Law of the State of
Minnesota.

No. CX–00–1175.

Supreme Court of Minnesota.

Jan. 25, 2001.

## OPINION

**PER CURIAM.**

The Director of the Office of Lawyers Professional Responsibility petitions this court to suspend indefinitely attorney Garrett T. Geiger from the practice of law in this state. The Director requests Geiger's suspension because he violated several professional conduct rules by: neglecting client matters; charging excessive fees and using improper fee arrangements; bringing a frivolous claim; providing incompetent representation; and failing to properly supervise subordinate attorneys.

Because Geiger failed to answer the Director's petition for disciplinary action, the allegations in the petition are deemed admitted. Therefore, the only question before this court is the proper discipline.

Geiger was admitted to practice law in Minnesota on August 20, 1992, and currently lives in Arlington Heights, Illinois. His license to practice law has been suspended since April 1, 1998, for nonpayment of licensure fees. Since his admission to practice law, Geiger has received two admonitions from the Director. In January 1995, Geiger was admonished for failing to promptly serve an amended complaint pursuant to a court order in violation of Minnesota Rules of Professional Conduct 1.3 [1] and 3.2.[2] In December 1996, the Director issued a second admonition for failure to adequately clarify the basis and rate of his fee in violation of Minn. R. Prof. Conduct 1.5(b),[3] and for failure to have a written contingent fee agreement in violation of 1.5(c).[4]

In the petition for disciplinary action, the Director accused Geiger of violating the Minnesota Rules of Professional Conduct in connection with five client matters. The Director stated that the cumulative effect of those violations is prejudicial to the administration of justice and therefore violates Minn. R. Prof. Conduct 8.4(d).[5] In his brief, the Director also accuses Geiger of noncooperation with the disciplinary investigation. Because the petition did not charge Geiger with noncooperation, however, any such allegations are not deemed

---

1. Minnesota Rules of Professional Conduct 1.3 states: "A lawyer shall act with reasonable diligence and promptness in representing a client."

2. Rule 3.2 provides: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

3. Rule 1.5(b) states: "When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."

4. Rule 1.5(c) states in part:

   A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated.

5. Rule 8.4(d) prohibits a lawyer from "engag[ing] in conduct that is prejudicial to the administration of justice."

admitted.[6] The Director explains that Geiger initially cooperated with the disciplinary investigation, but later failed to do so. Specifically, the Director complains that Geiger failed to appear for the originally scheduled prehearing meeting. Geiger then contacted the Director and arranged to appear at a second prehearing meeting by telephone. However, Geiger also failed to appear for the rescheduled meeting.

■ Because Geiger failed to respond to the petition for disciplinary action, the following acts of misconduct are deemed admitted pursuant to Rule 13(b), Rules on Lawyers Professional Responsibility.

*Palmer Matter*

In April 1995, Nancy Palmer retained Robert Brenner & Associates, Geiger's firm, to represent her in an employment dispute with First Bank Systems. In March 1996, Palmer's case was assigned to Geiger. The federal district court granted First Bank's motion for summary judgment on June 3, 1997. On June 11, 1997, Geiger wrote to Palmer to inform her of the court's decision and to explain her options: appeal the decision; attempt to negotiate a settlement; do nothing. Geiger also informed Palmer that her right to appeal expired on July 3, 1997. Palmer directed Geiger to attempt to negotiate a settlement and Geiger agreed to do so.

On June 26, 1997, Geiger called the office of James Selmer, First Bank's attorney, and spoke with Selmer's paralegal. Geiger explained that he intended to appeal on Palmer's behalf, but would consider a settlement. The paralegal conveyed this information to Selmer, and Selmer told the paralegal to find out what settlement Geiger proposed.

The paralegal called Geiger on June 26, 1997, but had to leave a message. Geiger did not respond until June 30, 1997, when he spoke with Selmer and confirmed that Palmer would appeal, but asked if First Bank Systems would consider a settlement of $10,000. Selmer stated that he would relay the settlement demand to his client and indicated that he would contact Geiger when he heard from First Bank.

Geiger did not speak with Selmer again before July 3, did not tell Palmer that the appeal deadline passed, and did not file an appeal. On July 9, 1997, Geiger moved the court, without informing Palmer, to extend his time for filing an appeal. In the motion, he explained that his failure to timely file was due to an illness that, since mid-May 1997, made him unable to concentrate and required him to take medication that frequently incapacitated him. Geiger did not identify the illness or the medication.

On July 31, 1997, the court denied Geiger's motion, finding that Geiger's illness did not amount to an extraordinary circumstance of excusable neglect and noting that Geiger had been able to draft other legal documents during his illness. On August 30, 1997, Geiger wrote to Palmer about the missed appeal and unsuccessful motion to extend the filing deadline.

The Director concluded that Geiger violated Minn. R. Prof. Conduct 1.3 and 1.4[7] when he failed to diligently pursue the matter and failed to keep Palmer informed. The Director also stated that

---

6. Rule 13(b) of the Rules on Lawyers Professional Responsibility provides: "If the respondent fails to file an answer within the time provided or any extension of time this Court may grant, the petition's allegations shall be deemed admitted and this Court may proceed under Rule 15." In July 2000, this Court entered an Order pursuant to Rule 13(b) stating that, because Geiger failed to file an answer to the Director's petition, the allegations in the petition were deemed admitted. *See In*

*re Garrett T. Geiger,* CX–00–1175, slip op. at 1 (Minn. July 27, 2000).

7. Rule 1.4 provides: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

Geiger violated Minn. R. Prof. Conduct 1.16 [8] by failing to withdraw from the case when he was allegedly impaired.

*Mahazu Matter*

Ibrahim Mahazu's employer terminated his employment in May 1993. With the help of an attorney, Mahazu filed a charge with the Equal Employment Opportunity Commission (EEOC) in February 1995. In March 1996, the EEOC sent Mahazu a right-to-sue letter and ended its involvement in the claim.

In April 1996, Mahazu entered into an agreement with Geiger's law firm that was entitled "STANDARD JOINT ATTORNEY FEE AGREEMENT (Contingency Non–Personal Injury)." It required Mahazu to pay a $2,500 nonrefundable retainer fee, none of which would be applied to the costs of the suit. Additionally, the agreement called for a division of fees between lawyers who were not in the same firm, but did not require each lawyer to assume joint responsibility.

On June 18, 1996, Geiger filed a summons and complaint in Mahazu's action. In January 1997, a settlement conference led to a $5,500 settlement. Approximately three weeks after the settlement conference, Mahazu signed a "Settlement Sheet" that addressed distribution of the settlement proceeds. Geiger would retain his one-third fee, $1,833, and $700 that remained unpaid from the $2,500 retainer. In the end, Geiger's total fee was more than 78 percent of the $5,500 recovery.

The Director concluded that this fee and the fee arrangement were unreasonable and violated Minn. R. Prof. Conduct 1.5.[9]

*Haken Matters*

Carol Thomas Haken was involved in disputes with the Minnesota Department of Human Services (MDHS) and Joseph Vogel. Haken and her husband retained Geiger to represent them in both disputes.

1. *Vogel Matter*

In summer 1996, Geiger served a summons and complaint in the Vogel matter. On August 30, 1996, Geiger received discovery demands from Vogel's attorney. The responses were due on October 3, 1996, but Geiger did not forward the materials to Haken until September 25, 1996. As a result, Haken did not have sufficient time to prepare a reply. Geiger called Vogel's attorney, Jacqueline Sparks, to request an extension of time to respond to the discovery demands. Sparks gave Geiger until October 17, 1996.

On October 11, 1996, Haken faxed information to Geiger for the discovery responses. Geiger failed to provide the responses to Sparks on October 17, 1996. On October 29, Sparks wrote to Geiger to remind him of his promise to provide the responses by October 17 and to demand a response by November 1, 1996. Geiger never replied to that demand.

On December 2, 1996, Sparks demanded that Geiger produce responses by December 16 or she would file a motion to compel. On December 15, Geiger sent unsigned, partial responses. On December

---

8. Rule 1.16, subd. (a), states in part:

   (a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:
   * * * *
   (2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client * * *.

9. Rule 1.5, parts (a) and (e), state in part:

   (a) A lawyer's fee shall be reasonable.

   * * * *
   (e) A division of fee between lawyers who are not in the same firm may be made only if:
   (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;
   (2) the client is advised of the share that each lawyer is to receive and does not object to the participation of all the lawyers involved; and
   (3) the total fee is reasonable.

23, Sparks wrote to Geiger to acknowledge receipt of the discovery responses and noted that many of them were insufficient. She asked Geiger to contact her to discuss the problems with the responses, but Geiger did not respond. On December 30, Sparks served and filed a motion to compel discovery. A hearing date was set for January 31, 1997.

On January 29, 1997, Geiger wrote to Sparks concerning her objections to the discovery responses, but did not provide additional information. Nonetheless, Sparks agreed to continue the motion hearing. On January 30, Sparks wrote to Geiger concerning the ongoing discovery, but Geiger did not respond. On February 11, 1997, Sparks wrote to Geiger and he finally contacted her to ask if the hearing that was scheduled for the next day could be rescheduled for March 5, 1997. Sparks agreed. After a series of communications in which Geiger continued to explain that he was trying to get information to allow him to respond to discovery, Sparks once again agreed to reschedule the hearing to March 26, 1997. However, Geiger failed to produce the responsive discovery documents by March 26.

On March 26, the parties appeared in court for the motion to compel. The court ordered the production of tax documents and amended the scheduling order. On April 3, Geiger produced some, but not all, of the ordered documents without offering an explanation for his failure to comply.

A new attorney representing Vogel continued to attempt to get various documents from Geiger, but Geiger still did not produce the documents. Vogel's attorney filed a second motion to compel, and the court again ordered Geiger to produce documents. On August 13, 1997, the day before a scheduled mediation session, Haken faxed Geiger a letter requesting that he cancel the mediation. On the same day, Geiger withdrew from representation.

### 2. *MDHS Matter*

In April 1996, Haken retained Geiger to represent Sincerely, Inc., a small company run by Haken and her husband, in the MDHS matter. On November 7, 1996, Haken wrote to Geiger questioning his failure to respond to her phone calls and asking for information about her case. On January 28, 1997, Haken again wrote to Geiger and demanded a date by which the summons and complaint would be ready. On January 31, 1997, Haken wrote to explain that she had received a notice from MDHS.

On February 3, 1997, Geiger wrote to Haken to say that he was forwarding a copy of the complaint. Geiger then served MDHS with the complaint. MDHS served Geiger with requests for production and with interrogatories, to which Geiger never provided proper responses. On June 12, 1997, Assistant Attorney General Mark Traynor prepared a motion for MDHS based on Sincerely, Inc.'s failure to provide full and complete answers to MDHS's interrogatories and production requests. On June 20, 1997, Geiger wrote to Traynor to apologize for not readying the promised discovery responses. Geiger attributed his failure, in part, to health problems. On June 20, Geiger also wrote to Haken about his mishandling of the case. He acknowledged that her concerns were legitimate and offered to withdraw. In August 1997, Haken retained a new firm to handle the Vogel and MDHS matters, and on September 17, 1997, Geiger filed his notice of withdrawal with the Office of Administrative Hearings.

The Director concluded that Geiger's actions in both the Vogel and MDHS matters violated Minn. R. Prof. Conduct 1.3 and 1.4 because he failed to diligently pursue the matters and failed to reasonably communicate with his clients.

### *Smith Matter*

On December 12, 1993, Merlon Smith retained Geiger to represent him in a claim against Dr. Leonard Goldman. Un-

der the terms of Geiger's contingent fee agreement, Smith paid a $2,500 nonrefundable retainer. The agreement did not inform Smith that the funds would not be held in a trust account or that he might not receive a refund of the funds if he chose to terminate his attorney-client relationship with Geiger. It did not explain whether the expenses would be deducted before or after the contingent fee was calculated. The Director concluded that the fee agreement violated Minn. R. Prof. Conduct 1.5 and Lawyers Professional Responsibility Board Opinion No. 15.[10]

Geiger prepared a complaint in which he alleged that Dr. Goldman negligently failed to exercise the skill and learning required in the practice of medicine. Dr. Goldman moved for summary judgment, alleging that Smith was never Dr. Goldman's patient. On September 14, 1994, Geiger wrote to Smith about the motion for summary judgment and explained that, after researching the matter, Geiger learned that a doctor-patient relationship was a prerequisite for a medical malpractice claim. On September 23, the district court granted the motion for summary judgment and noted that Smith had no legal cause of action for medical malpractice. The Director determined that Geiger's conduct demonstrated a lack of competence in violation of Minn. R. Prof. Conduct 1.1,[11] and that Geiger brought a frivolous claim in violation of Minn. R. Prof. Conduct 3.1 .[12]

*Nicholas Matter*

Robert Nicholas retained Geiger's firm, Robert Brenner & Associates, to represent him in a discrimination matter against Northwest Racquet Swim & Health Clubs (Northwest) and John Clay. Newly-admitted attorney, George Veith, was assigned to the case. On November 14, 1995, Robert Brenner was placed on a disciplinary suspension and Geiger took over operation of the firm, which became known as the Sharp Law Firm.

In spring 1996, Veith had not commenced a suit against Clay even though he had had the case for two years. In May 1996, Veith left the Sharp Law Firm. Brenner, now working in a nonattorney position, assigned the matter to Trent Jonas, another recently-admitted attorney.

In June 1996, Nicholas retained the Sharp Law Firm to represent him in an action against Northwest. He had until August 5, 1996, to serve Northwest. On August 3, 1996, Jonas addressed a summons and complaint to "Northwest Racquet Swim & Health Clubs, Inc." at its corporate office, but the letter did not identify anyone authorized to accept service and it did not include an acknowledgement of receipt of summons and complaint. Northwest received the letter on August 7.

On August 20, 1996, Jonas tried again to serve Northwest by mail. He directed the summons and complaint to two individuals who he believed were authorized to accept service and he included an acknowledgement of receipt of summons and complaint. The acknowledgement of receipt was never signed or returned. On October 8, 1996, Jonas made a third attempt to serve Northwest by having his brother personal-

10. For our purposes, the key portion of Lawyers Professional Responsibility Board Opinion No. 15 states:

All availability or nonrefundable retainer agreements must include a final paragraph immediately above the client signature line which informs the client that: (1) the funds will not be held in a trust account; and (2) the client may not receive a refund of the fees if the client later chooses not to hire the lawyer or chooses to terminate the lawyer's services.

11. Rule 1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

12. Rule 3.1 states, in part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law."

ly serve a copy of the summons and complaint. On October 23, 1996, Northwest answered and asserted that it had not been properly served and that the statute of limitations barred Nicholas's claim. About this time, Jonas ended his association with the Sharp Law Firm and Geiger temporarily took over the case.

In spring 1997, Geiger assigned Nicholas's claim against Clay to Stephen Hance, another recently-admitted attorney. In August 1997, Nicholas contacted Geiger to express concern over the handling of his case. On August 12, Geiger responded that he had serious doubts about Nicholas's chances of success and that he, Geiger, was leaving the practice soon and Nicholas's case would have to be transferred anyway.

On October 3, 1997, Geiger wrote to Nicholas and explained that his case represented "too much risk for the Sharp Law Firm." Geiger explained that the contingent fee agreement therefore permitted him to withdraw from representation. On November 3, 1997, Geiger filed a petition of withdrawal and the court granted his request.

The Director concluded that Geiger's conduct reflected a lack of diligence in violation of Minn. R. Prof. Conduct 1.3, and that Geiger failed to properly supervise subordinate attorneys in violation of Minn. R. Prof. Conduct 5.1.[13]

■ Based on Geiger's misconduct in the Palmer, Mahazu, Haken, Smith, and Nicolas matters, the Director asks that Geiger be indefinitely suspended from the practice of law. The Director argues that because of the nature and cumulative effect of Geiger's violations—particularly the repeated instances of client neglect—indefinite suspension is appropriate. The Director suggests that indefinite suspension is appropriate because it would require Geiger to participate in a Rule 18 procedure[14] before he could be reinstated, and this would give the court a chance to consider his ability to practice law before reinstating him.

■ Because we deem the allegations in the Director's petition admitted, the only issue before the court is the proper discipline for Geiger. "The purpose of attorney discipline is not to punish the attorney, but rather to guard the administration of justice and to protect the courts, the legal profession, and the public." *In re Merlin*, 572 N.W.2d 737, 741 (Minn. 1998) (internal quotation marks omitted). In determining the proper discipline, this court considers: (1) the nature of the misconduct; (2) the cumulative weight of the violations; (3) the harm to the public; and (4) the harm to the legal profession. *See id.* The court also considers aggravating or mitigating circumstances. *See In re Graham*, 609 N.W.2d 894, 896 (Minn.2000). An attorney's disciplinary history is another relevant consideration. *See id.* When reviewing the disciplinary history, we expect to see "a renewed commitment to

---

13. Rule 5.1(b) states: "A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct."

14. Rule 18 of the Rules on Lawyers Professional Responsibility provides, in part:

(a) **Petition for reinstatement.** A petition for reinstatement to practice law shall be served upon the Director and the President of the State Bar Association. The original petition, with proof of service, and seven copies, shall then be filed with this Court. Together with the petition served upon the Director's Office, a petitioner

seeking reinstatement shall pay to the Director a fee of $300.

(b) **Investigation; report.** The Director shall investigate and report the Director's conclusions to a Panel.

(c) **Recommendation.** The Panel may conduct a hearing and shall make its recommendation. The recommendation shall be served upon the petitioner and filed with this Court.

(d) **Hearing before Court.** There shall be a hearing before this Court on the petition unless otherwise ordered by this Court. This Court may appoint a referee. If a referee is appointed, the same procedure shall be followed as under Rule 14.

comprehensive ethical and professional behavior after a disciplinary proceeding, and [w]here leniency has been shown once, we are reluctant to do so again." *Id.* (internal quotation marks omitted). Even where no single act of misconduct standing alone warrants severe public discipline, the cumulative weight and severity of multiple disciplinary rule violations may compel such discipline. *See In re Jones*, 383 N.W.2d 303, 307 (Minn.1986). Although the court decides each case individually on its facts, other discipline cases provide guidance in determining the proper sanction. *See Graham*, 609 N.W.2d at 896.

Geiger's actions in the Palmer, Smith, Nicholas, and Haken matters demonstrate a pattern of neglecting client matters. He failed to diligently pursue claims, failed to pursue an appeal, continued his representation despite what was by his own account a debilitating illness, and failed to adequately communicate with his clients. In addition to these acts of neglect, he failed to provide competent representation to a client. This court typically imposes indefinite suspension in cases involving a continued pattern of client neglect when no evidence of mitigating circumstances is present. *See Merlin*, 572 N.W.2d at 741 ("Indefinite suspension is typical in cases involving continued or repeated neglect of client matters without evidence of mitigating circumstances."); *In re Levenstein*, 438 N.W.2d 665, 668 (Minn.1989) ("Cases involving continued or repeated neglect of client matters have traditionally warranted severe sanctions. Absent mitigating circumstances, typically we have ordered indefinite suspension."). Even in cases where an attorney is involved in only one instance of client neglect, when that neglect is combined with other violations we have often suspended or disbarred the attorney. *See In re Thedens*, 557 N.W.2d 344, 349 (Minn.1997). In *In re Muenchrath*, we ordered indefinite suspension when an attorney neglected two client matters, failed to communicate with clients, misrepresented to clients that he performed work on their files that he never performed, and failed to cooperate with the disciplinary investigation. 588 N.W.2d 497, 501–02 (1999). In another case, we ordered indefinite suspension when an attorney failed to diligently pursue client matters, failed to return client phone calls, and failed to cooperate in the disciplinary investigation. *See In re Kinnunen*, 502 N.W.2d 773, 774–75 (Minn. 1993). In reaching our decision to impose indefinite suspension, we emphasized Kinnunen's "failure to pursue his clients' claims and to return their phone calls." *Id.* at 774.

In addition to Geiger's acts of client neglect, he charged an unreasonable fee to Mahazu and used a fee agreement in the Smith matter that violated Minn. R. Prof. Conduct 1.5. Geiger also has used an improper fee arrangement in the past. Charging excessive or illegal fees "provide[s] a basis for imposing discipline, depending on the egregiousness of that conduct, ranging from public reprimand to suspension, or, when charging excessive fees was one of several acts of misconduct, to disbarment." *In re Simmonds*, 415 N.W.2d 673, 677 (Minn.1987) (citations omitted).

Geiger's history of client neglect and fee violations, taken together with the instances in which he failed to properly supervise subordinate attorneys in violation of Rule 5.1 and brought a frivolous claim in violation of Rule 3.1, warrants indefinite suspension. The violations before us are aggravated by Geiger's past admonitions for essentially the same type of behavior for which he is now being disciplined. *See In re Dillon*, 371 N.W.2d 548, 552 (Minn.1985) ("Not only did [respondent] borrow money from [his client] without disclosing conflicting interest and secure the loan with his contingent fee, he attempted to charge an illegal and excessive fee, misrepresenting his entitlement to it, *the more serious because he had received a prior warning * * * with respect to the charging of excessive fees*." (emphasis added)). Far from

demonstrating a "renewed commitment to comprehensive ethical and professional behavior," Geiger has displayed a stubborn unwillingness to correct or improve his behavior. *Graham,* 609 N.W.2d at 896.

Geiger's misconduct has resulted in harm to the public and to the profession. Conduct like Geiger's subjects the profession to severe scrutiny and criticism and contributes to the public's general mistrust of attorneys. *Cf. In re Franke,* 345 N.W.2d 224, 229 (Minn.1984) ("There is a less tangible, yet no less real, harm to the public-at-large that occurs when an attorney's conduct is the subject of negative media attention."). Moreover, Geiger directly harmed the profession when he brought a nonmeritorious suit, caused numerous delays for opposing counsel, the court, and his clients, and forced opposing counsel to file motions to compel discovery, which in turn required that a district court order Geiger to produce documents. *See Franke,* 345 N.W.2d at 229 (recognizing harm to the profession when "the record is replete with instances in which the * * * courts * * * had to order respondent to submit the required legal documents. Delays were common."). Similarly, Geiger's conduct directly harmed his clients. For instance, Palmer lost her right to appeal her case and Geiger made only weak and unsuccessful efforts to negotiate a settlement on her behalf. Smith paid for incompetent representation. Additionally, the many delays caused by Geiger likely increased his fees.

For all these reasons, we order that:

1. Respondent Geiger be suspended indefinitely from the practice of law.

2. If respondent seeks reinstatement, he must file a petition for reinstatement pursuant to Rule 18, Rules on Lawyers Professional Responsibility.

3. Respondent comply with the requirements of Rule 26, Rules on Lawyers Professional Responsibility.

4. Respondent pay to the Director the sum of $900 in costs and disbursements pursuant to Rule 24, Rules on Lawyers Professional Responsibility.

Indefinite suspension ordered.